615 A.2d 390

**Wendy M. MASTROMATTEO, Appellant,**

v.

**Ronald HARKINS.**

Superior Court of Pennsylvania.

Argued May 1, 1992.

Filed Oct. 21, 1992.

330

Nina B. Shapiro, Lancaster, for appellant.

Douglas H. Cody, Lancaster, for appellee.

Before ROWLEY, President Judge, and WIEAND, McEWEN, DEL SOLE, MONTEMURO, BECK, TAMILIA, KELLY and JOHNSON, JJ.

JOHNSON, Judge:

Wendy M. Mastromatteo appeals a December 6, 1989 order which vacated a jury verdict finding Ronald Harkins to be the father of Amber Lynn Mastromatteo. The trial court held that the introduction of DNA test results at trial was improper under the standard articulated by this Court in *Koleski v. Park*, 363 Pa.Super. 22, 525 A.2d 405 (1987). We hold that the *Koleski* standard does not apply in the present case and reverse the order of the trial court and remand for reinstatement of the jury's verdict.

Before addressing the issues presented on appeal, a review of the procedural history of this case is necessary. In November, 1983, Mastromatteo filed an action against Harkins for the financial support and maintenance of her daughter. Harkins denied paternity. The parties and the child submitted to human leukocyte antigen (HLA) blood tests which indicated that the probability of paternity was 99.4%. Following a trial held before the Honorable D. Richard Eckman, the jury rendered its verdict in favor of Harkins. Mastromatteo filed a Motion for Post–Trial Relief requesting a new trial which was granted by the trial court on the ground that the jury had been instructed to apply the wrong standard of proof. Harkins did not appeal the grant of a new trial.

Prior to the second trial, Mastromatteo petitioned for DNA testing to determine paternity. *See generally* Note, *DNA Fingerprinting: Evidence of the Future*, 79 Ky.L.J. 415

(1990–91); Comment, *Trial by Certainty*, 39 Emory L.J. 309 (1990); Jeffreys, Wilson, Thein, *Hypervariable "Minisatellite" Regions in Human DNA*, 314 Nature 67 (1985). Harkins contested the petition and both parties filed briefs to support their positions. Mastromatteo filed a second petition for DNA testing, which the motions court subsequently granted, ordering the parties and the child to submit to DNA testing. The DNA test indicated that Harkins possessed all seventeen of the seventeen paternal bands that were found in the DNA of the child. The DNA test results indicated the probability that this result would have occurred by chance to be one in seventeen billion.

Before the second jury trial, Harkins contested the admissibility of the DNA test results. The trial court concluded that the test results were admissible. Following the second jury trial, a verdict was rendered against Harkins, finding paternity. Harkins filed a timely Motion for Post–Trial Relief requesting a new trial. Rather than granting the relief Harkins requested, the trial court vacated the jury's verdict. Mastromatteo's subsequent Motion for Reconsideration was denied and this appeal followed.

Before addressing the merits of this appeal, we must examine the standard of review utilized when a trial court merely vacates the jury verdict without granting a new trial. In this case, the jury rendered its verdict against Harkins. Harkins, through his post-trial motion, alleged an error of law, that the results of the DNA tests were improperly admitted at trial. Harkins then requested the proper relief from the trial court, the grant of a new trial. In our review of the record, we will determine if the introduction of the DNA test results constituted an error of law which properly should have supported the grant of a new trial. As the reviewing court in this case, we will impose a standard of review as if the trial court had granted the requested relief and we will determine if the grant of a new trial would be proper. While the grant of a new trial is within the sound discretion of the trial judge, that discretion is not absolute; an appellate court will review the action of the trial court and reverse if it determines that the

trial court acted capriciously or palpably abused its discretion. *Burrell v. Philadelphia Electric Company*, 438 Pa. 286, 265 A.2d 516 (1970); *Burton v. Boland*, 339 Pa.Super. 444, 489 A.2d 243 (1985).

Mastromatteo contends that the DNA tests were properly admissible at trial and that the trial court abused its discretion in vacating the jury verdict. We agree.

■ The Pennsylvania legislature has empowered courts in paternity actions for support to order DNA tests under the provisions of 23 Pa.C.S. § 4343(c)(1) and (c)(2):

(c) **Genetic tests.—**

(1) Upon the request of any party to an action to establish paternity, the court shall require the child and the parties to submit to genetic tests.

(2) Genetic test results shall be considered prima facie evidence of paternity.

This statute, on its face, requires that a court order the child and the parties in a paternity action to submit to genetic testing if any party requests such testing. Here, Mastromatteo requested genetic testing, in the form of DNA tests, from the motions court prior to the second trial. Under 23 Pa.C.S. § 4343, the motions court properly granted Mastromatteo's request.

The trial court, however, stated that the admission of the DNA test results was prohibited under *Koleski v. Park, supra*, because Harkins' Fourth Amendment and due process rights had been violated. Trial court opinion at 5–7. We determine that the trial court erred in its finding that the DNA test results were inadmissible; we also determine that *Koleski* does not apply in the present case.

In *Koleski*, an appeal was taken from an order for a mother and child to submit to a second HLA test after a first HLA test had excluded the person claiming paternity as the father of the child. In that case, we interpreted 23 Pa.C.S. § 5104 and whether it permitted the drawing of duplicate blood tests.

23 Pa.C.S. § 5104 states in pertinent part:

**(c) Authority for the test.**—In any matter subject to this section in which paternity, parentage or identity of a child is a relevant fact, the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, may or, upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. If any party refuses to submit to the tests, the court may resolve the question of paternity, parentage or identity of a child against the party or enforce its order if the rights of others and the interests of justice so require.

■ In *Koleski,* we were unable to discern clear authority under Pa.C.S. § 5104 for performing duplicate blood tests. There, recognizing the Fourth Amendment implications in the extraction of blood, we stated that due to the potential for harassment inherent in paternity proceedings, before the mother could be ordered to submit to a duplicate blood test, the proponent of further testing must indicate that the first test was defective and that further testing was needed for an accurate determination of paternity. *Koleski, supra,* 363 Pa.Super. at 31, 525 A.2d at 408. We also concluded that in order to satisfy due process requirements, the determination of the need for further testing should be made at a hearing at which expert testimony would be introduced. *Koleski, supra,* 363 Pa.Super. at 32, 525 A.2d at 409.

■ Our holding in *Koleski* is inapplicable in the present case. Here, Mastromatteo relied on the HLA test during the first trial as the result indicated with a 99.4% probability that Harkins was the father. While this result was highly probative evidence that Harkins was the father of the child, it was not dispositive or definite proof of paternity. *See Smith v. Shaffer,* 511 Pa. 421, 515 A.2d 527 (1986); *Turek v. Hardy,* 312 Pa.Super. 158, 458 A.2d 562 (1983). Upon the grant of a new trial, Mastromatteo sought to introduce additional evidence of paternity, in the form of DNA tests, that could more accurately identify Harkins at the father of her child. *See* Comment, *DNA Identification Tests and the Courts,* 63 Wash.L.Rev.

903, 948 (1988). The evidence presented by DNA testing was not cumulative or duplicative of the HLA test results which were also introduced during the second trial. Testimony at the second trial indicated that the DNA tests, which had yet to be developed at the time of the first trial, excluded the world's population, other than Harkins, from the probability of paternity. *See* N.T., at 116.

The DNA test cannot be construed as a second test measuring the same information available through the HLA test results. Rather, we consider the request for DNA testing as a request for the production of new information relevant to the determination of paternity. As such, the blood extraction for DNA tests in this case is not controlled by our holding in *Koleski.*

We find that the public policy concerns we addressed in *Koleski* were not present here. Rather than serving to harass Harkins, all parties and the interest of justice would be served by allowing the most accurate method of paternity testing to be performed on the parties in this case.

We also recognize that the extraction of blood may implicate the Fourth Amendment right to be free of unreasonable searches and seizures. The trial court found that the drawing of blood to perform the DNA tests violated Harkins Fourth Amendment rights. Trial Court Opinion at 7–8. The Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances or which are made in an improper manner. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). *Accord Commonwealth v. Hipp,* 380 Pa.Super. 345, 551 A.2d 1086 (1988). A court must balance the interests at stake to determine whether the invasion caused by the extraction of blood is justified. *John M. v. Paula T.,* 524 Pa. 306, 316, 571 A.2d 1380, 1385 (1990) *cert. denied,* 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990). The right of the individual to be free from the burden of a blood extraction must be balanced against the entitlement of children to know and be supported, financially and emotionally, by their fathers. Harkins' right to bodily integrity must

also be balanced against the right and interest of the general population to have fathers share in the financial support of their children rather than have society bear that portion of the parental burden. In this case, we do not have the benefit of the reasoning of the motions court which ordered the DNA testing. However, we find in the application of this balancing test that the right to have the most definitive determination of paternity available to all parties in this case outweighs the minimal intrusion necessary to accomplish this task.

The trial court also found, relying on our decision in *Koleski*, that Harkins' Fourteenth Amendment rights to procedural due process had been violated in that no hearing was held prior to the order for DNA testing. We hold that the trial court erred in this finding.

In *Koleski*, we found that since there must be a determination of a defect in the results of the first HLA test before a second HLA test could be ordered, a hearing must be held at which experts could testify to the accuracy of the initial test. In this case, there is no need to find that the HLA test is defective prior to ordering DNA testing. Due Process is a flexible notion which calls for such procedural safeguards as a particular situation demands to ensure fundamental fairness to a potentially aggrieved litigant. *Corra v. Coll*, 305 Pa.Super. 179, 451 A.2d 480 (1982); *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). In *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court directed that three factors must be considered when a court determines if the process given to a party was constitutionally infirm. Those factors are: the private interests at stake; the risk that the process given will result in erroneous deprivation of that interest; the government interest, including the fiscal and administrative burden entailed in the substitute procedure. *Id.*

In this case, the private interests include Harkins' right not to have the bodily intrusion involved in the extraction of blood and the rights of all parties to the most accurate paternity determination of the child in question. The second interest at stake is the risk that Harkins would be unable to have notice

of, or properly contest, the extraction of blood for the DNA test without a formal hearing. The Commonwealth's interest in this procedure is that determinations of paternity proceed smoothly without undue delay. The Commonwealth also has a fiscal interest in avoiding unnecessary court proceedings at which expert testimony must be introduced, if a fair and just determination of an issue can be made without such a procedure.

In this case, the motions court and all parties had notice and an opportunity to express legal and factual argument on the issue of DNA testing. The parties had a chance to respond to one another in their briefs and before the motions court. Both parties were present in motions court with an opportunity to be heard on this issue prior to the court issuing the order for the DNA tests. On the record before us we are not persuaded that Harkins suffered an erroneous deprivation of his rights to procedural due process through the procedure utilized in the present case. The Commonwealth's interests in judicial and financial economy were served by having this determination made through the motions court without the need to convene a special judicial session to take testimony on this issue. In this case, unlike *Koleski,* there was no need to determine that the first HLA test was defective, since the DNA test was not to replace the HLA test but to provide an additional, more accurate, determination of paternity.

After a review of the record, we are satisfied that the process given here was sufficient and that Harkins suffered no violation of his right to procedural due process.

We find that the motions court, after affording all parties the right to be heard, properly ordered the DNA tests to be performed. We also hold, after balancing the interests at stake and finding no constitutional violation, that the DNA tests were relevant and probative evidence and, as such, the DNA tests were admissible under the statutory authority of both 23 Pa.C.S. § 4343 and § 5104. Accordingly, we hold that the trial court abused its discretion in vacating the jury's verdict. We, therefore, reverse the order of the trial court and remand for reinstatement of the jury's verdict.

Order vacated and remanded for reinstatement of the jury's verdict.

BECK, J., joins and files a concurring opinion.

TAMILIA, J., files a dissenting opinion.

BECK, Judge, concurring.

The majority's analysis and disposition of this matter are clearly correct and I join therein.

I write separately simply to underscore the distinctions between the issue posed here and that posed in *Koleski v. Park,* 363 Pa.Super. 22, 525 A.2d 405 (1987), a decision that I authored.[1]

In *Koleski,* we considered the constitutional implications of ordering a party to a paternity action to undergo a *duplicate* blood test. We concluded that in such a situation, the party whose blood was sought to be extracted a second time for the performance of the selfsame test had the right to a determination that the initial test was defective. We also held that this determination was to be made at a hearing at which expert testimony relative to the alleged defective test was presented. *Id.,* 363 Pa.Super. at 28–34, 525 A.2d at 408–10. We reached these conclusions after consideration of the protections afforded by the Fourth Amendment and the Due Process Clause of

---

1. In a dissent joined by no other member of this panel, Judge Tamilia attacks this author's concurrence. He states that the author does not know and cannot know how the members of the *Koleski* panel would have voted in the instant case. He then concludes that this fact somehow renders this author's view on the subject of the proper interpretation of *Koleski* inaccurate. He further accuses this writer of undermining the integrity of the opinions of this court.

   The dissent's observations and reasoning are facially specious. First, this concurrence states the view of the author hereof and does not even purport to be a statement of the view of anyone else. Even the most cursory reading of this concurrence makes this fact obvious. Second, the analysis of *Koleski* and its proper application to the case at bar that is set forth in this concurrence is a logical and honest statement of this writer's view and is agreed to by all members of the en banc panel with the exception of Judge Tamilia. It in no way undermines the integrity of this court's opinions and, in fact, is completely consistent both with this court's prior opinions and with the majority opinion in this very case.

the United States Constitution. In analyzing these protections, we balanced the interests of all parties and the Commonwealth in an accurate paternity determination against the bodily integrity of the person whose blood was sought and the possibility of harassment through demands for duplicate blood tests.

In contrast, in the case *sub judice* we are not reviewing an order requiring a duplicate blood test. Rather, the issue here is whether a second blood extraction should have been ordered to permit the performance of a new and completely different genetic paternity test which, because of its high degree of accuracy, would substantially aid in the determination of paternity. Under these very different facts, our analysis logically must differ from that pursued in *Koleski*. As the majority notes, we have here no hint of harassment. Rather, we perceive only that the request for genetic testing resulted from the desire to amass new and highly reliable scientific evidence of paternity to be used at the retrial of this matter. Clearly, the interests of all concerned in an accurate paternity determination is well served by permitting such evidence to be obtained and admitted at the second trial.

Moreover, the Due Process analysis pursued in *Koleski* is simply inapposite to this matter. In *Koleski*, we required a hearing at which expert testimony would be presented prior to an order requiring a second blood test. We required a hearing and expert testimony because we found that such was necessary for the accurate resolution of the central factual issue, i.e. defect in the first test. Here, on the other hand, no such finding need be made since the request for genetic testing in no way depends upon an alleged defect in the first test. In the circumstances of this case, the due process afforded the parties through the process of briefing and argument on the legal question of whether the genetic testing was to be allowed was clearly sufficient.

Therefore, I join in the majority's determination that the trial court should be reversed.

TAMILIA, Judge, dissenting.

I respectfully dissent as I believe the majority has misconstrued the effect of the Uniform Blood Test Act's, 23 Pa.C.S. § 5104, limitation on retesting and has, by implication, overruled *Koleski v. Park,* 363 Pa.Super. 22, 525 A.2d 405 (1987), which stated the correct legal standard. The fact that a new trial was granted cannot be construed to mean that a second blood test was permissible when the validity of the first test was never questioned. The majority, in a purely subjective finding, does not construe the second test to be harassment despite the fact that without procedural or technical error in the first test, it would permit a second test to take advantage of a more definitive scientific measurement.

When application of statutes result in a conflict between them, the Statutory Construction Act, 1 Pa.C.S. § 1932, Statutes in pari materia, requires that they be read in such a manner, if possible, to eliminate any conflict. The introduction of genetic testing, pursuant to 23 Pa.C.S. § 4343, Paternity (as amended 1989, Dec. 20, P.L. 654, No. 81, § 1, immd. effective) did not overrule or make inoperative the Uniform Blood Test Act. Indeed, as both laws are contained in the Domestic Relations Code, it is irrational to determine that the taking of blood (as opposed to the testing itself) was subject to limitations under one procedure but not under the other.

In what appears to be revisionist action, the majority strongly attempts to disregard the unequivocal language of *Koleski,* which is founded on constitutional provisions to prevent harassment, and to go around it by not overruling it. *Koleski* must either be overruled or it must be followed. *Koleski* makes no distinction between the various tests utilized in determining the issue of paternity, whether it be A–B–O, M–N, Rh–Hr blood groupings, HLA, human leukocyte antigen, or DNA, the genetic test. The issue is not whether new evidence would be available by a different test but whether multiple testing is permissible under any circumstances unless the initial testing was in some form technically defective and this was determined in a fact finding hearing by the court. The fact that one test as opposed to another will be more probative of paternity has nothing to do with the right of the

state to impose two or more blood tests on a defendant when the original blood test was not proven to be defective. The use of the HLA test results in the retrial, with proper jury instructions, would most likely have achieved the same results as the more definitive genetic DNA test. To permit the second test and to admit its results just because it was more certain simply means that this Court accepts an invasive procedure which violates due process as detailed in *Koleski* because it approves of the result.

No area of domestic relations has been met with greater scrutiny than paternity proceedings. While in the foreseeable future DNA testing holds the promise of certainty in paternity disputes, there are still sufficient questions to be resolved concerning the indexing of DNA paternity probabilities to make premature the more extravagant claims.

In an article titled *D.N.A. Paternity Probabilities* by D.H. Kaye, *Family Law Quarterly,* Vol. 24, 1991, the author states:

> Some of the advertising literature of companies marketing DNA tests or products endorses this notion that the results are "conclusive," with a "[t]hirty-billion-to-one accuracy."
>
> These are heady claims that can be expected to impress attorneys and courts. "Conclusive" proof would spare courts and attorneys the agony of probabilities and other numbers associated with conventional genetic testing for paternity, and it would expeditiously resolve much contentious litigation over child support, inheritance, immigration and sexual assault. However, the field of scientific evidence is littered with the deflated hopes and assurances of would-be fingerprinters. Surely, in any particular case, the genetic evidence might amount to something less than conclusive proof either because the laboratory personnel have not found what they think they've found, or because the findings, while accurate enough, do not justify the inference of paternity with certainty.

*Id.* at 281.

After pursuing an extremely technical analysis of the procedures and scientific and statistical data that are involved in DNA testing, the author concludes:

Claims in the popular press and a few court opinions that DNA "fingerprints" constitute evidence of identity in paternity and other cases pose a danger of misunderstanding. DNA typing is not a single procedure that yields equally revealing results in all paternity cases. There are a variety of methods already in routine use, and the application of other techniques can be anticipated. Some methods entail a greater chance of error in the "typing" than others, while the "types" found in some forms of analysis are more probative. Thus, within the forensic armamentarium of DNA tests are methods that can give rise to immensely powerful evidence for or against paternity as well as methods that can yield less impressive, but still helpful, results.

*Id.* at 303.

Even the legislative determination in 23 Pa.C.S. § 4343, "(c) Genetic tests.... 2) Genetic test results shall be considered prima facie evidence of paternity ..." is subject to qualification based upon the reliability of the results in accordance with the techniques used. Within the past year, there was serious question of the reliability of DNA testing in sexual assault cases, which called into question the sufficiency of the evidence used to convict numerous people throughout the country. We cannot justify the result in permitting the introduction of the test in this case, because its result was statistically so certain, even if it is in the interest of the public and the individuals involved to have this certainty. As indicated above, there is still scientific question as to the validity of those results. Above all, we cannot ignore the holding in *Koleski*, which unequivocally prevents retesting unless there was a defect in the procedure, simply to allow another test which produces a more certain result. The language in *Koleski* allows for no interpretation or distinguishment such as propounded by the majority. Judge Beck's attempt to reinterpret *Koleski* in light of the facts in this case is totally unacceptable because, while she authored the Opinion, she cannot speak for Judges Hester and Roberts who joined in that Opinion. It is inconceivable that she would now be able to say what would have been that panels decision if they had

before them the facts in this case as well as the facts in *Koleski* to consider. To make such a retroactive revision undermines the integrity of our Opinions and turns them into conjectures rather than guides to the Bench and Bar.

In *Koleski,* Judge Beck, speaking for the majority, stated:

In sum, we reiterate our belief, first expression in *Corra v. Coll,* 305 Pa.Super. 179, 193–194, 451 A.2d 480, 488 (1982), that "[t]here is no situation of more monumental importance, or more worthy of due process protection, than the creation of a parent-child relationship." We find that a hearing is the best forum for making the showing that the first blood tests were inaccurate. Requiring this showing before a second blood extraction will be ordered protects the parties' Fourth Amendment rights and restricts the potential for harassment, but does not prevent a party from obtaining further blood testing where necessary to an accurate determination of paternity.

*Id.,* 363 Pa.Super. at 33, 525 A.2d at 410.

Judge Perezous was following the precise mandate of *Koleski* in refusing to admit the second blood test. Nothing the majority has written convinces me that he was wrong and there is justification for permitting a second blood test. A new trial is not a basis for requiring a second test without a hearing or showing that the first test was defective because it involves the same parties, the same issues and the same blood withdrawal. I would affirm on the excellent Opinion of the trial court.