D.C. v. E.A.

C.P. of Washington County, no. 1465 DR 1993.

*Thomas O. Schmitt,* for plaintiff.
*Sanford S. Finder,* for defendant.
*J. Alan Fucher,* for Domestic Relations Section, C.P. of Washington County.

GILMORE, *J.,* June 26, 1995—This matter is before the court on the plaintiff's motion seeking court approval for a second paternity test. An evidentiary hearing on the motion was held on February 27, 1995, at which the plaintiff requested the court to order the defendant to submit to further paternity testing in the form of Human Leucocyte Antigen blood testing. Since the plaintiff's motion to allow retest does not specifically state what kind of testing is to be performed, the court will treat this as a motion to allow retest generally, without limiting the type of testing which may be ordered.

The child whose paternity is at issue, R.C., was born on November 4, 1993. After an initial attempt to put the child up for adoption together with the defendant, the plaintiff preferred to keep the child and filed for support. A conference and hearing on the issue of support was held on February 1, 1994, at which the defendant denied paternity. On February 8, 1994, this court issued an order directing the Domestic Relations Office to schedule an HLA blood test. Between the date of that order and the date of the paternity test on June 14, 1994, the court changed the method of paternity testing for local paternity cases (not including those that involve the Uniform Reciprocal Enforcement of Support Act) from blood extraction to buccal swab DNA sampling. Mother, child, and putative father submitted to buccal swab DNA testing on June 14, 1994. The results of that test excluded the defendant from paternity.

Based on the test results, this court issued a rule to show cause why the support complaint against the defendant should not be dismissed. The plaintiff filed an answer to the rule and new matter raising two claims: 1) that the defendant is estopped from denying paternity, and 2) that buccal swab paternity testing is scientifically flawed. By memorandum and order of September 29, 1994, this court rejected the plaintiff's estoppel argument and ordered an evidentiary hearing held on the issue of the scientific soundness of the buccal swab DNA test.

Although the purported purpose of the hearing was to evaluate the use of buccal swab DNA testing, the plaintiff offered very little evidence in support of the proposition that the testing is scientifically flawed. The plaintiff introduced the report of Dr. Moses S. Schanfield, Ph.D., Laboratory Director of Analytical Genetic Testing Center Inc. Dr. Schanfield states in his report that his company does not use buccal swab testing for paternity cases because buccal swabs preclude the use of non-DNA markers available in blood testing. He objects to the buccal swab on the grounds that the DNA extracted is unidentifiable (other than the labeling of the samples) and unlike blood testing, there is no mechanism for identifying errors in sample handling. At no point does Dr. Schanfield attack the scientific validity of buccal swab testing, nor does he suggest that the test itself yields inaccurate results. He disapproves of this method of testing because if a mix-up had been made in handling the samples, then determining the identity of the samples would be impossible.

Dr. Schanfield's objections to DNA-only tests are not persuasive after examining the history of DNA tests in paternity matters. At the hearing, the testimony indicated that DNA tests have been accepted in paternity

cases since 1985 (N.T. p. 6), and that buccal swab DNA testing has been performed by Roche Biomedical Laboratories Inc., the company that performed the tests in this case, since 1993 when it accepted a contract to perform paternity testing for the State of Arkansas. (N.T. p. 18.) In the State of Arkansas alone, Roche Biomedical Laboratories has performed over 8,000 buccal swab DNA paternity tests. The widespread use of DNA-only paternity testing weighs heavily against Dr. Schanfield's personal objections. Clearly, this method of paternity testing has been accepted by the scientific community. Consequently, this court will not find that the test is scientifically flawed in the absence of direct, concrete, and persuasive evidence to the contrary. In this regard, the plaintiff has failed to carry her burden of proof.

The hearing then developed into an argument over whether the plaintiff was entitled to a second paternity test in the form of an HLA blood test. The criteria for determining whether a party to a paternity action is entitled to a blood test, after a paternity test has already been performed, have been put forth by the Pennsylvania Supreme Court in *DeAngelo v. Murray,* 536 Pa. 206, 638 A.2d 966 (1994). See also, *Koleski v. Park,* 363 Pa. Super. 22, 525 A.2d 405 (1987); *Mastromatteo v. Harkins,* 419 Pa. Super. 329, 615 A.2d 390 (1992); *Paroby v. Godek,* 403 Pa. Super. 313, 588 A.2d 967 (1991). Under *DeAngelo, supra,* the person seeking retest must prove by a preponderance of the evidence that the latest test in time was defective.

"Additional testing will not be permitted merely on the basis that different tests reach different results. Rather, this court requires a showing that the latest test administered was defectively performed." *Id.* at 210, 638 A.2d at 968.

The plaintiff has not introduced any evidence to support her claim that the test was defective. The plaintiff's argument on this point is that even though there is no evidence that the samples were not switched, the possibility of human error exists. Plaintiff contends that the samples could have been switched, and thus, she is entitled to a subsequent test. This argument attempts to shift the burden of proof to the defendant to prove that the test was not defective. The court rejects this attempt by the plaintiff to shift her burden to the defendant.

The plaintiff then argues that forcing her to prove that the latest test was defective creates an impossible burden. However, the case of *Paroby v. Godek, supra,* demonstrates a situation in which the movant has met the burden of proving that the latest test was defective. In that case, the court ordered the evidentiary hearing required by *Koleski, supra.* At the hearing the plaintiff was able to prove that the test was defective by introducing evidence that the defendant was so frightened of the needle that an insufficient quantity of blood was drawn and the laboratory could not perform the tests on the quantity extracted. See also, *Connell v. Connell,* 329 Pa. Super. 1, 477 A.2d 872 (1984). In *Paroby, supra,* the fact that the latest test performed was defective was evident from the fact that the test yielded no results whatsoever.

The facts in the case at bar are vastly different than the circumstances encountered in *Paroby, supra.* In *Paroby* the moving party introduced evidence that the test was defective because the amount of blood extracted was insufficient to produce accurate results. In this case the plaintiff merely argues that human error somewhere in the chain of custody could have caused the respective samples to be switched. However, a suggestion of human

error is not evidence that the latest test was defective. In addition, the court rejects the plaintiff's attempt to prove this point by producing pending cases of disgruntled parties against Roche Biomedical Laboratories Inc. Even if the plaintiff proves with these cases that samples had been switched in the past by Roche Biomedical Laboratories, that would not be evidence that the samples were switched in this case.

The plaintiff next argues that she is entitled to an HLA blood test in addition to a DNA test based on *Mastromatteo, supra.* Plaintiff cites *Mastromatteo* for the proposition that:

"The DNA test cannot be construed as a second test measuring the same information available through the HLA test results. Rather, we consider the request for DNA testing as a request for the production of new information relevant to the determination of paternity. As such, the blood extraction for DNA tests in this case is not controlled by our holding in *Koleski.*" *Id.* at 336, 615 A.2d at 393.

Plaintiff argues that the case at bar is similar to *Mastromatteo,* such that the court can ignore the *Koleski* test that the previous test be proven by a preponderance of the evidence to be defective, and instead order a second test on the basis that it is new evidence to be considered by the finder of fact.

However, the court disagrees with the plaintiff's interpretation of that case. *Mastromatteo, supra,* does not stand for the proposition asserted by the plaintiff. *Mastromatteo* stands for the proposition that the extraction of blood for genetic testing *after* the extraction of blood for HLA testing is justified because the genetic testing is more accurate than HLA testing. In order to protect a party's Fourth Amendment rights, a balancing test is used. *Id.* at 336, 615 A.2d at 393-94. One of those

factors (and the one that the court found to be decisive) is the accuracy of the determination of paternity. *Id.* at 337, 615 A.2d at 394. In fact, *Koleski, supra,* cites *Little v. Streater,* 452 U.S. 1, 13, 101 S.Ct. 2202, 2209, 68 L.Ed.2d 627 (1981) for the proposition that the child's interest in an accurate determination of paternity is a compelling one. *Id.* at 30, 525 A.2d at 408. The reason why the court in *Mastromatteo, supra,* allowed a second blood extraction for the purpose of genetic testing was that it found that genetic testing is more accurate and precise than HLA testing. The court stated: "[i]n this case, unlike *Koleski,* there was no need to determine that the first HLA test was defective, since the DNA test was not to replace the HLA test but to provide an additional, more accurate, determination of paternity." *Id.* at 338, 615 A.2d at 394. The present case presents the opposite scenario where the plaintiff is asking the court to order the HLA blood test after the genetic test. *Mastromatteo, supra,* does not give the plaintiff the right to both a DNA test and an HLA blood test under these circumstances since the more accurate test has already been performed.

The basis for requiring such scrutiny prior to ordering second or subsequent tests is that the extraction of blood imposes upon the defendant's right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution. At least as far back as *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) the extraction of blood has been found to implicate Fourth Amendment protections. Nevertheless, those protections do not prevent the extraction of blood under all circumstances, but only requires that the interests favoring extraction outweigh those in opposition to it. As the court stated in *Mastromatteo, supra:* "[a] court must balance the

interests at stake to determine whether the invasion caused by the extraction of blood is justified." *Id.* at 336, 615 A.2d at 393 (citing *John M. v. Paula T.,* 524 Pa. 306, 316, 571 A.2d 1380, 1385 (1990), *cert. denied,* 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990). The courts of Pennsylvania have considered these protections in fashioning rules governing the extraction of blood for subsequent paternity testing.

Prior to buccal swab specimen extraction the preceding analysis would have disposed of the plaintiff's motion to allow retest because blood testing was the only way to obtain fairly accurate results in assessing the probability of paternity. The issue then becomes whether the extraction of DNA through buccal swab is as great an intrusion upon one's privacy as the extraction of blood, thus requiring this court to apply the *DeAngelo* test in evaluating the constitutionality of a subsequent test. After careful consideration of this issue the court holds that buccal swab testing does not rise to the same level of intrusiveness as a blood test.

At the hearing, Dr. Clifton Harris, Associate Director, Department of Paternity Evaluation, Roche Biomedical Laboratories Inc., testified to the methodology of collecting DNA samples by buccal swab. Dr. Harris testified that the samples are collected by taking a swab and rubbing it against the inside cheek of the person being tested:

"A buccal swab is a glorified Q-Tip, is what I like to call it. It's sterile and the buccal swab procedure itself is simply taking a cotton covered or Dacron covered wooden stick and simply sticking it in between the teeth and the inner cheek lining and then gently swabbing that surface which frees up some cells known as buccal epithelial cells. Those cells contain intact DNA which can be tested. Those cells are normally sloughed off in the normal process of regeneration,

just like skin. So there's no loss to the individual. The procedure is noninvasive, which means that there's essentially no risk of infection, there's no pain, there is very little anxiety and trauma associated with the procedure. The samples are very stable over long periods of time when kept dry and we do dry the samples immediately after collection and they remain dry at the laboratory." (N.T. pp. 7-8.)

Unlike blood testing, the use of a buccal swab does not involve the use of a needle that punctures the skin and enters the body for the purpose of gathering genetic material. The lack of a needle entering the body reduces the fear and anxiety that persons undergoing paternity testing would experience. See *Paroby, supra,* and *Connell, supra.* This lack of fear and anxiety weighs against giving the buccal swab the same Fourth Amendment protections that are implicated by blood testing. Also, the buccal swab method also presents a lower risk of infection since no foreign body is being introduced to the inside of a person's body. Finally, the buccal swab removes only dead cells from the person's cheek, whereas the blood test removes live blood cells. All of these differences demonstrate that the buccal swab is not as intrusive as the blood test.

The minimal intrusiveness of the buccal swab collection method relieves the court of the necessity of applying the *DeAngelo* test, since the buccal swab does not implicate Fourth Amendment protections. Once the Fourth Amendment protections are eliminated from the subsequent test analysis, the court finds that the plaintiff is entitled to an order requiring the defendant to submit to subsequent buccal swab DNA paternity testing. The courts of this Commonwealth have found that HLA blood tests are merely evidence of paternity. *Smith v. Shaffer,* 511 Pa. 421, 515 A.2d 527 (1986); and *Stahli*

*v. Whitman,* 412 Pa. Super. 281, 603 A.2d 583 (1992). In the same vein, genetic tests are also merely evidence of paternity even though 23 Pa.C.S. §4343(c)(2) provides that they are "prima facie" evidence of paternity. See also, *Stahli v. Whitman, supra.* Even though this evidence is prima facie, it is rebuttable by evidence introduced to support the contrary proposition. Thus, even if the genetic tests reach one conclusion, the finder of fact may find the opposite conclusion if the party attacking that test can overcome the presumption raised by the test.

Once the constitutional barriers to a subsequent test have been removed, both parties are entitled to gather evidence for the support of their respective cases. In the past, paternity tests excluding a putative father have been used as if they were de facto conclusive. The reason for this practice was that the parties could usually obtain but one test because the tests performed were blood tests, and thus the standard for obtaining a subsequent test was proof that the previous test was defective under *DeAngelo, supra.* However, when the subsequent test to be performed is not a blood test, but rather a buccal swab test, both parties should be allowed to gather evidence for their cases. If this were any other type of civil case, no thought or concern would be given to each side having their own scientific tests. Therefore, the court holds that a subsequent buccal swab test may be ordered without a showing that the latest test was defective. The plaintiff's motion to allow retest is granted on that basis.

## ORDER

And now, June 26, 1995, based upon the opinion filed herewith, the Domestic Relations Office is ordered to schedule a paternity test in the above case.