Submitted on record and briefs April 1, affirmed August 31, 2005

STATE OF OREGON,
acting by and through the Department of Justice
and the Division of Child Support,
*Respondent,*

*v.*

Michael SPRING,
*Appellant,*

*and*

Kimberly S. PHILLIPS,
*Respondent.*

0330034C; A122897

120 P3d 1

Michael Spring filed the briefs *pro se*.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Judy C. Lucas, Assistant Attorney General, filed the brief for respondent State of Oregon.

No appearance for respondent Kimberly S. Phillips.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

LANDAU, P. J.

**LANDAU, P. J.**

This is an action for paternity and to establish child support. The Division of Child Support (DCS) issued an administrative support order and money judgment based on the mother's affidavit and appellant Michael Spring's failure to submit to parentage testing. When DCS filed the order and judgment in circuit court, Spring responded with a request for a declaratory judgment that the relevant statutes that require him to submit to parentage testing violate state and federal constitutional prohibitions against unreasonable searches and seizures. The trial court rejected Spring's contention and entered judgment establishing paternity and ordering Spring to pay child support. Spring appeals, asserting once again that the statutes requiring him to submit to paternity testing are unconstitutional. We affirm.

The relevant facts are not in dispute. Phillips gave birth to M on August 28, 2001, and filed with DCS an affidavit in support of establishing paternity that named Spring as the father. The affidavit stated that Spring was the father of the child, that Phillips told him that he was the father of the child, that he admitted being the father of the child, that Spring had visited the child, and that Spring remarked to Phillips that M had a birth mark that matched one on Spring's older son.

Pursuant to ORS 416.415,[1] DCS served Spring with a notice and finding of financial responsibility and a proposed final order. Spring responded with a denial of paternity. Pursuant to ORS 416.430,[2] DCS then served Spring with a notice

---

[1] ORS 416.415 provides, in part:

"(1)(a) At any time after the state is assigned support rights, a public assistance payment is made, an application for enforcement services under ORS 25.080 is made by an individual who is not a recipient of public assistance or a written request for enforcement of a support obligation is received from the state agency of another state responsible for administering the federal child support enforcement program, the administrator may, if there is no court order, issue a notice and finding of financial responsibility."

[2] ORS 416.430 provides, in part:

"(4)(a) If paternity is alleged under ORS 416.415(3) and a written response denying paternity and requesting a hearing is received within the time period allowed in ORS 416.415(2), * * * the administrator, subject to the provisions of subsections (5) and (6) of this section, shall certify the matter to

to appear to provide a DNA sample for parentage testing, informing him that, if he failed to "submit to parentage tests, or * * * to respond, [DCS] may decide the question of paternity against [him]." In Oregon, such DNA testing is conducted on a sample taken by a swab from the inside of the mouth of the person being tested. *See* ORS 109.251 (defining "blood tests" to include "any test for genetic markers to determine paternity of a type generally acknowledged as reliable * * * including, but not limited to * * * any test that extracts genetic material from any human tissue"). Spring refused to provide such a sample. He and DCS exchanged a series of letters in which DCS repeatedly informed him that, to proceed to a hearing on the issue of paternity, he must first submit to DNA testing, and in which he responded that DCS did not have authority to "compel [him] to obey [the] notice" and that he was entitled to a hearing to establish paternity before it could require him to provide a DNA sample. Finally, DCS filed with the court a default child support and money judgment and filiation certificate.

In response to the default judgment and filiation certificate, Spring filed a "notice of refusal for fraud," arguing that DCS's default judgment was invalid because the agency had deliberately misrepresented that he had not requested a hearing. Spring also filed a motion for relief from judgment and for a declaratory judgment, contending that the default judgment was invalid on a number of grounds and requesting the court to declare his constitutional rights to be free from the DNA testing demanded by DCS. On the motion of DCS, the trial court vacated the default judgment because the parties had not been properly served.

The trial court then held a hearing on the matter of Spring's motion for declaratory judgment. The trial court denied that motion, addressing Spring's due process and search and seizure rights in a letter opinion. The trial court

---

the circuit court for a determination based upon the contents of the file and any evidence which may be produced at trial. * * *

"* * * * *

"(5) An action to establish paternity initiated under ORS 416.400 to 416.470 shall not be certified to court for trial unless all of the following have occurred:

"(a) Blood tests have been conducted[.]"

ruled that a hearing on parentage was not necessary as a predicate to requiring Spring to submit to DCS's DNA screening and ordered Spring to provide a DNA sample. Rather than submit to the tests, Spring moved for a new trial, insisting that DCS must provide some affirmative evidence of his paternity before it could require him to provide a blood sample. The trial court denied that motion and found Spring in violation of its order to submit to parentage tests. As noted, the court ultimately entered a judgment establishing paternity and a support and money judgment against him.

On appeal, Spring contends that the DNA test that is required under ORS 416.430(5)(a) is an infringement on his rights under Article I, section 9, of the Oregon Constitution and the Fourth and Fourteenth Amendments to the United States Constitution to be free from unreasonable searches and seizures and that he was entitled to a hearing on the matter of his parentage of M before being required to submit to the DNA testing. He does not contend that the trial court's failure to hold a hearing on the factual basis for the DNA testing violated his due process rights. Rather, he contends that "the search of [his] DNA must first be determined to be reasonable by an independent and impartial tribunal." Thus, we understand Spring's argument to be that the state and federal constitutions require DCS to establish probable cause before a neutral magistrate—that is, to obtain a warrant—before it can require him to provide the blood sample.

DCS counters that the trial court did not err in denying Spring's motion for a declaratory judgment because the DNA screening at issue is a valid administrative search under the Oregon Constitution. According to DCS, the DNA testing also does not violate the federal constitution because, on balance, the state's interest in establishing M's paternity outweighs Spring's interest in being free from the intrusion of a DNA test. We agree with DCS on both issues.

■■ We review a trial court's determination whether a search complies with the constitution for errors of law. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). Both state and federal constitutions require that searches and seizures must not be unreasonable. Article I, section 9, provides:

> "No law shall violate the right to the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The Fourth Amendment similarly provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Analysis under both clauses requires that we determine whether the state action at issue constitutes a "search" and, if so, whether that search is reasonable.

We begin with the Oregon Constitution, addressing first the question whether the "blood test" that the statute requires constitutes a "search" within the meaning of Article I, section 9. In *State v. Milligan*, 304 Or 659, 664, 748 P2d 130 (1988), the Supreme Court held that extracting blood is a search that implicates the reasonableness requirement of Article I, section 9. Similarly, in *Weber v. Oakridge School District 76*, 184 Or App 415, 426, 56 P3d 504 (2002), *rev den*, 335 Or 422 (2003), we concluded that random urinalysis of student athletes constitutes a search under the state constitution. We reasoned that such procedures constitute an intrusion by a governmental agent into the protected privacy interest of the individual, in that they permitted the state to learn about the most personal of medical details about an individual's private life that would not be known to the public in general. *Id.*

The procedure involved in this case—obtaining genetic material by swabbing the inside of an individual's cheek—certainly is less invasive than, say, piercing the skin with a syringe. But, in our view, it remains materially indistinguishable from blood draws or urine samples by which the state obtains bodily fluids that are not ordinarily available for public inspection. It is, accordingly, a search within the meaning of Article I, section 9.

■ We turn to the question whether such a search is reasonable. Whether a search is reasonable depends on the purpose and type of search undertaken. *Weber*, 184 Or App at 431. Searches designed to aid in the enforcement of criminal laws are reasonable only when conducted pursuant to a warrant or when one of the enumerated exceptions applies. *Id.* In contrast, an administrative search is reasonable if it is conducted for a purpose other than criminal law enforcement, pursuant to a policy authorized by a politically accountable law-making body, and that policy eliminates the discretion of those responsible for conducting the search. *State v. Coleman*, 196 Or App 125, 129, 100 P3d 1085 (2004), *rev den*, 338 Or 16 (2005).

In this case, we conclude that the DNA testing at issue is a reasonable administrative search under the Oregon Constitution for three reasons. First, it is conducted for the purpose of determining the paternity of, and thereby the financial responsibility for, children in this state " 'a purpose other than the enforcement of laws by means of criminal sanctions.' " *Weber*, 184 Or App at 434 (quoting *State v. Anderson*, 304 Or 139, 141, 743 P2d 715 (1987)). Second, it is conducted pursuant to ORS 416.430, the legislative embodiment of the policy enacted by the Oregon legislature. Finally, ORS 416.430 eliminates the discretion of those entrusted with administering the test—*every* person who denies paternity and seeks a hearing in the circuit court on that issue must first provide DCS with a DNA sample. The trial court did not err in denying Spring's motion for a declaratory judgment that ORS 416.430 violates Article I, section 9, of the Oregon Constitution.

■ We turn to Spring's contention that ORS 416.430 violates the Fourth Amendment to the United States Constitution. We begin with whether the "blood test" at issue is a search. In *Schmerber v. California*, 384 US 757, 767, 86 S Ct 1826, 16 L Ed 2d 908 (1966), the United States Supreme Court concluded that the "compulsory administration of a blood test * * * plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment."

■ ■ The question remains whether such a search is reasonable under the Fourth Amendment. Reasonableness of

a search under that constitutional provision generally is judged by balancing the degree of intrusion into an individual's Fourth Amendment interest against that intrusion's promotion of legitimate government interests. *Vernonia School Dist. 47J v. Acton*, 515 US 646, 652-53, 115 S Ct 2386, 132 L Ed 2d 564 (1995). Although generally even an unwarranted search must be supported by probable cause, a search that is "unsupported by probable cause can be constitutional * * * 'when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.' " *Id.* at 653 (quoting *Griffin v. Wisconsin*, 483 US 868, 873, 107 S Ct 3164, 97 L Ed 2d 709 (1987)).

In this case, we note initially that the intrusion into Spring's reasonable expectation of privacy is minimal. As the Court observed in *Schmerber*, " '[t]he blood test procedure has become routine in our everyday life.' " 384 US at 771 n 13 (quoting *Breithaupt v. Abram*, 352 US 432, 436, 77 S Ct 408, 1 L Ed 2d 448 (1957)). Moreover, the blood test required under ORS 416.430(5)(a) is used only to establish paternity, its scope is strictly limited to its purpose, and it is applied identically to all who are required to submit a sample. Finally, the state's interest in this case—ensuring that the children of Oregon receive the financial support to which they are entitled—is significant. On balance, that interest outweighs the minimal intrusion on personal liberty occasioned by a blood test.

We note in passing that other courts have similarly decided that such tests comply with the mandates of the Fourth Amendment. *E.g.*, *People ex rel Black v. Neby*, 265 Ill App 3d 203, 205, 638 NE2d 276, 277, *appeal den,* 642 NE2d 1301 (1994); *In the Interest of Minor Child, JM,* 590 So 2d 565 (La 1991); *Mastromatteo v. Harkins*, 419 Pa Super 329, 336, 615 A2d 390 (1992); *State v. Meacham*, 93 Wash 2d 735, 738-39, 612 P2d 795, 798, (1980). To be sure, a number of those courts have concluded that at least a "reasonable possibility" or a *"prima facie"* showing of paternity must precede an order to submit to testing. *See, e.g., In re the Interest of Minor Child, JM,* 590 So 2d at 568 ("[B]efore the court may issue an order for compulsory blood testing, the moving party must show that there is a reasonable possibility of paternity."); *State ex rel. McGuire v. Howe*, 44 Wash App 559, 563, 723

P2d 452, 454, (1986) (requiring "reasonable possibility or prima facie case"). Assuming such a requirement applies, however, Spring has not explained why the submissions in this case do not satisfy it. *See, e.g., Schnectady County Dept. v. Robert J.*, 510 NYS2d 289 (1987) (affidavit from mother sufficient to establish *prima facie* showing of sexual relations with alleged father).

We conclude that the trial court did not err in denying Spring's motion for a declaratory judgment that ORS 416.430 violates the search and seizure guarantees of the state and federal constitutions.

Spring advances other arguments as well, which we reject without discussion.

Affirmed.