646 A.2d 1238

**Stephanie D. ZEARFOSS, Appellee,**

v.

**Michael FRATTAROLI, Appellant.**

Superior Court of Pennsylvania.

Argued June 22, 1994.

Filed Aug. 19, 1994.

---

Charles P. Buchanio, Lebanon, for appellant.

Samuel A. Kline, Lebanon, for appellee.

Before OLSZEWSKI, POPOVICH and JOHNSON, JJ.

POPOVICH, Judge:

This case involves an appeal from the order of the Court of Common Pleas of Lebanon County granting a motion for summary judgment in favor of the plaintiff, Stephanie Zearfoss, and against the defendant, Michael Frattaroli. We reverse.

■ The standard of review in assessing the grant of a motion for summary judgment requires a court to view the record (including the pleadings and depositions, if any, answers to interrogatories, admissions on file and supporting affidavits) in a light most favorable to the non-moving party. See *McDonald v. Marriott Corp.*, 388 Pa.Super. 121, 564 A.2d 1296 (1989). Judgment shall be entered if the *record* shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Pa.R.Civ.P. 1035(b).

The plaintiff filed a complaint in April of 1992 against the defendant for support of Larissa Dawn Zearfoss (born Janu-

ary 13, 1981), alleged to be the defendant's child born out of wedlock.

The defendant filed an Answer and New Matter denying paternity and requesting a blood test (H.L.A.). Further, the defendant filed a Motion For Discovery And Request For Trial By Jury, wherein he alleged that he was never the spouse of the plaintiff nor did he reside with her during the period of conception. Additionally, the defendant asserted he was not listed on any birth certificate as the child's father and the plaintiff "indicated both to the Hershey Medical Center (the hospital at which the child was born) and to the Office of Public Assistance for the County of Lebanon, that another named individual was the father of the minor child...." Paragraph 6. Lastly, statements of another person being the putative father were made by the plaintiff at or near the time of the minor child's birth. *Id.* at 7.

In reply to the defendant's Motion, the plaintiff denied the defendant's assertions of non-cohabitation, non-paternity and naming individuals other than the defendant as the father. The plaintiff also insisted that the child was baptized in the defendant's church and his name appears on the baptismal certificate as the father.

By order of court dated September 29, 1992, a request for a jury trial and discovery was granted, with all parties agreeing to respond to interrogatories. The defendant was to have access to reports of the Domestic Relations Office (from the Department of Public Assistance) and the Hershey Medical Center regarding the birth.

Each party filed answers to the other's interrogatories. The plaintiff indicated that she first had sexual intercourse with the defendant in late 1979; prior to conception (calculated to be Memorial Day weekend of 1980) "Plaintiff only had sexual intercourse with Defendant *and only* Defendant for a period of approximately 2 years prior to conception of their daughter"; for approximately 1 year after the birth of the child the plaintiff and defendant lived together and the defendant supported both plaintiff and child; and the plaintiff

denied having sex with the defendant's brother in 1980 or admitting the same to the defendant following the birth of the child. See Plaintiff's Answers to Defendant's Interrogatories at Nos. 7, 15, 28, 38 & 39.

In contrast, the defendant's interrogatories disclosed that he first had sexual intercourse with the plaintiff in late 1979, but the two "were not seeing each other" by December of 1979. The two reunited mid-July on through the balance of 1980.

The defendant believed he was the father of the child because the plaintiff's "projected delivery date [w]as *April of 1981.*" In fact, the plaintiff and defendant lived together from October 1, 1980, until the birth of the child on *January 13, 1981.* Thereafter, the plaintiff and child returned to reside with her parents. See Defendant's Answers to Plaintiff's Interrogatories at Nos. 6, 8, 14 & 15.

It was not until after the birth of the child that the defendant claimed his brother told him he had sexual intercourse with the plaintiff during 1980. *Id.* at 23 & 25. Defendant also indicated that while the plaintiff and child lived with him, he supported the child "indirectly." *Id.* at 32. However, he denied that he had the child baptized. *Id.* at 35.

By motion and rule to show cause, the plaintiff's request for genetic testing (D.N.A.) was granted, despite the defendant's objection that H.L.A. blood testing had already been performed. Further, the court authorized a second set of D.N.A. tests when the first proved incomplete.

Interestingly, in the defendant's Pre–Trial Conference Memorandum there is mention (via Exhibits "D" & "E"— Child Support Action Notice (dated 4/16/81) & Lebanon County's Domestic Relations Assistance Form (dated 3/2/81), respectively) that the plaintiff "could not name/identify father of the child." Likewise, Exhibit "C" in the same Memorandum (captioned Application for Support for plaintiff and child (dated 2/11/81) contained the remarks: "client was seeing 3 different men at same time while living in Erie, Pa.")

Next, the court continued trial to allow H.L.A. blood testing of the defendant's brother (Terrance A. Frattaroli). The

results excluded the brother as the child's father. What followed was the plaintiff's Motion for Summary Judgment, wherein it was alleged that the defendant had denied paternity but, albeit refusing to acknowledge the authenticity of the first and second blood tests (showing a probability of fatherhood to be 99.86% (H.L.A.) and 99.89% (D.N.A.), respectively), stipulated to the admission of the third test (D.N.A., showing a probability of paternity of 99.99%).

The plaintiff argued that, inasmuch as the appellant's *only* defense (set forth in answer to Plaintiff's Interrogatories at Nos. 22–25) had been rebutted with the exclusion of his brother as the father of the child, "there [wa]s no genuine issue as to the material fact, namely, that Defendant [wa]s the biological father of Larissa Dawn Zearfoss...." The court agreed and entered judgment in favor of the plaintiff. This appeal followed raising two issues:

1. THE *ENTIRE* RECORD AVAILABLE FOR THE LOWER COURT'S RULING ADEQUATELY RAISED THE APPELLANT'S DEFENSE TO THE ISSUE OF PATERNITY DESPITE THE H.L.A. AND D.N.A. TEST RESULTS;

2. Pa.R.C.P. NO. 1910.15(b) MANDATES A *TRIAL* ON THE ISSUE OF PATERNITY IN THE ABSENCE OF APPELLANT'S ACKNOWLEDGMENT OF PATERNITY.

Appellant's Brief at 6 (Emphasis in original).

 In addressing the first issue, we note that blood testing (with regard to paternity) is not conclusive in this Commonwealth. It is but one factor to be weighed in the totality of the evidence presented on the question of paternity. See *Smith v. Shaffer*, 511 Pa. 421, 515 A.2d 527, 529 (1986) (blood test result of 99.99% is not conclusive of paternity); *Mastromatteo v. Harkins*, 419 Pa.Super. 329, 615 A.2d 390 (1992) (semble); *Turek v. Hardy*, 312 Pa.Super. 158, 458 A.2d 562, 565 & n. 6 (1983) (semble).

For the court to imply otherwise, be it because of the stipulation to the second D.N.A. test by the defendant (proba-

bility of paternity being 99.99%) allegedly leaving no genuine issue of material fact to be resolved, is presumptive and refuted by the record.

For example, the court indicates that the defendant's "only raised defense" appears in his Answer—"he is not the father of the child"—and *is of no consequence* [1] because he alleges "in his answers to interrogatories that his brother, Terrance Frattaroli, is the child's father, but blood tests subsequently excluded his brother as the father. * * * In summary, Defendant will not be able to offer a defense to defeat Plaintiff's prima facie case; thus, the issue of paternity is not a genuine issue of material fact." Court Opinion, 9/30/93 at 5. We disagree.

When a court attempts to substitute its assessment of the facts for that of a jury, the courts of appeal in this jurisdiction are quick to draw in the reins of the judiciary in an area reserved exclusively for a trier-of-fact to decide. For instance, in *Smith*, supra, our Supreme Court reversed this Court's affirmance of a Common Pleas Court granting a natural mother/appellee's post-trial motion for a new trial.

In *Smith*, the issue was one of the appellant/Shaffer being the biological father of an infant born to the appellee. At trial, the appellee testified that she had sex only with the appellant during the possible period of conception. The appellee's expert, a hematologist, testified that the H.L.A. blood tests established a 99.99% probability that the appellant was the biological father.

The appellant denied having sex with the appellee and he produced the appellee's brother to testify that he (appellee's

---

**1.** It is as if the court dismisses out-of-hand the defendant's version of the events leading to and after the birth of the minor child, a scenario which is at odds with the plaintiff's account of what occurred during that same period of time. These factual disputes (e.g., access to the plaintiff during the period of conception is denied by the defendant) are matters for the trier-of-fact to resolve since, if believed, they would exonerate the defendant from liability.

Blood tests, in and of themselves, are not definitive proof of paternity. On the contrary, all the facts must be assessed by the trier-of-fact, including but not limited to the test results, in reaching a decision on paternity. See *Tyler v. King*, 344 Pa.Super. 78, 496 A.2d 16 (1985).

brother) saw appellee's stepfather fondle appellee during the conception period and was present when appellee's mother took appellee and her sisters to truck stops and returned with money. The jury rendered a verdict for the appellant.

The court, sitting en banc, granted the appellee a new trial on the ground that, inter alia, "... the strong scientific evidence ... support[s] the [appellee's] claim and the lack of credible testimony to the contrary, [indicates] the award of a new trial is imperative." On appeal from this Court's affirmance of the court en banc's award of a new trial, the Supreme Court reversed and, in doing so, held that the court en banc had abused its discretion:

In the instant case, it is apparent that the court en banc "invaded the exclusive domain of the jury," and "exceeded the limits of judicial discretion." *The testimony presented by the parties and the witnesses for appellant and appellee was in direct conflict. Appellee's claim of paternity was supported by her testimony and the opinion of her expert witness. Appellee's denial of paternity was supported by his testimony and the testimony of his witness, [appellee's brother].* "The determination of credibility is solely for the trier of fact." *Adoption of S.H.*, 476 Pa. 608, 615, 383 A.2d 529, 532 (1978). The jury in the instant case, by rendering a verdict for appellant, obviously resolved the credibility of the witnesses and the conflict in testimony of the witnesses and the conflict in testimony in favor of appellant, as was its prerogative. The conclusion of the court en banc, i.e., that the verdict was against the weight of the evidence, was based on *its* reassessment of the credibility of the witnesses, a matter exclusively within the province of the jury.

The court en banc's reassessment of credibility was obviously influenced by the weight it placed upon the opinion of appellee's expert witness (99.99% probability that appellant was the father), since that court found the award of a new trial was imperative "in light of the strong scientific evidence supporting the [appellee's] claim and the lack of credible testimony to the contrary...." * * * It was improper for the court to elevate the opinion of the expert

witness to such lofty heights in light of the jury's finding that appellant's and his witness' testimony were credible. As this Court stated in *Tinicum Real Estate Holding Co. v. Commonwealth Department of Transportation,* 480 Pa. 220, 232, 389 A.2d 1034, 1040 (1978), "in determining the facts the jury has the right to believe all, some of, or none of the experts' testimony. Furthermore, it was the jury's duty to consider all of the facts and circumstances established by the trial evidence...."

\* \* \* \* \* \*

... the general rule in this Commonwealth [is] that expert opinion testimony is not conclusive and must be considered in conjunction with all of the evidence introduced at trial, *HLA tests are not conclusive of paternity.*

511 Pa. at 426, 515 A.2d at 528–29 (Footnote omitted; citations omitted in part; emphasis added in part).

Consistent with the precepts recited in *Smith,* this Court in *Tyler v. King,* 344 Pa.Super. 78, 496 A.2d 16 (1985), upheld a court's ruling that the appellant was the biological father of the appellee's daughter.

In *Tyler,* the appellee testified that she met the appellant on July 25, 1980, and had sex with him that night at his home. She also admitted having sex from April to July of 1980 with another man. In turn, the appellant denied having sex with the appellee at his home on July 25th because his girlfriend and their daughter were living there. The appellant claimed he did not meet the appellee until October of 1980. Further, the appellee testified that she lied when she told the appellant that she had used contraceptives, and that she had told a friend of the appellant that another man may have fathered the child.

H.L.A. blood tests were conducted and the appellant stipulated to the results as some evidence of paternity. However, at the close of the appellee's case, the appellant sought a dismissal on the ground that the Commonwealth had not presented any statistical evidence, in the form of expert testimony, to explain the test results. The motion was denied

and the court found the appellant to be the father of appellee's child.

On appeal, the appellant challenged the finding of paternity on various grounds, one of which was the court's failure to call expert witnesses to interpret (H.L.A.) blood tests conducted pursuant to the predecessor to 23 Pa.C.S.A. § 5104(d), i.e., 42 Pa.C.S.A. § 6134. In disposing of this contention this Court made remarks relevant to the case at bar; to-wit:

... we disagree with the appellant that Section 6134 requires the court to call the described experts in all cases. First, the Act itself allows paternity determinations to be made without blood tests. Section 6133 [now found at 23 Pa.C.S.A. § 5104(c)] states that "[i]f any party refuses to submit to such tests, the court may resolve the question of paternity, parentage or identity of a child *against* such party, or enforce its order if the rights of others and the interests of justice so require" (emphasis added). *See also Smith v. Beard,* 326 Pa.Super. 95, 473 A.2d 625 (1984). In addition, expert testimony is not the sole or paramount form of evidence used in paternity cases. Section 6123(b)(3), governing the use of blood tests in criminal proceedings, allows the court to direct a verdict for the defendant "upon the conclusions of all the experts under the provisions of Section 6136 [now found at 23 Pa.C.S.A. § 5104(f)] relating to effect of test results, *otherwise* the case shall be submitted for determination upon *all* the evidence" (emphasis added). Section 6136, in turn, provides that "[i]f the experts disagree in their findings or conclusions, the question shall be submitted upon *all* the evidence." (emphasis added).

*These sections ... demonstrate the Legislature's second intent, that the trier of fact decide paternity questions on all the evidence, not just on the pronouncements of experts. * * * Logically, a "trier of fact" would be unnecessary in paternity cases if the verdicts were to be reached by the witnesses.*

344 Pa.Super. at 85–87, 496 A.2d at 20–21 (Emphasis added in part).

■ What is to be gleaned from the pronouncements of *Smith* and *Tyler* is that: (1) blood tests are *not* conclusive evidence of paternity,[2] they are but one of the fibers which go into making the pattern of evidence either proving or disproving paternity; and (2) it is within the province of the trier-of-fact to believe all, some or none of the evidence presented. This translates into the finder-of-fact (be it jury or judge) having it within its prerogative to hold for the putative father/defendant and against the natural mother/plaintiff in a paternity action, regardless of the introduction of one or multiple blood tests (be they of the H.L.A. or D.N.A. variety) establishing a 99.99% probability of paternity, *if the other facts are supportive of such a verdict.*

If such were not the case, there would be no need for a hearing to assess the various versions proffered by the parties surrounding the events leading to the birth of a child alleged to be the defendant's. Rather, all one would have to do is submit the results of the blood test(s) performed on the parties and anything over the 99 percentile level would warrant a finding of paternity against the contestant/defendant. However, this is *not* the law, at least in this Commonwealth. As stated by this Court in *Tyler:*

> ... the trier of fact decide[s] paternity questions on all the evidence, not just the pronouncements of experts.... Logically, a "trier of fact" would be unnecessary in paternity cases if the verdicts were to be reached by the witnesses.

344 Pa.Super. at 87, 496 A.2d at 21.

■ It still remains the finder-of-fact's duty to evaluate *all* of the evidence (e.g., expert testimony on test results or the admission of test results stipulated to by the parties), *which*

---

**2.** See 23 Pa.C.S.A. § 5104(f), which provides that if all experts agree that blood tests exclude a defendant as a possible father, the question of paternity is to be resolved accordingly. "Absent a legislatively enacted provision making positive blood tests also conclusive[, which the Legislature had the opportunity to do with the repeal of 42 Pa.C.S.A. § 6136 and replacing it with 23 Pa.C.S.A. § 5104(f) by the Act of December 19, 1990, P.L. 1240, No. 206], we must view them[, i.e., blood tests for paternity,] as only part of the evidence." See *Turek v. Hardy,* 312 Pa.Super. 158, 458 A.2d 562, 565 (1983) (citing 42 Pa.C.S.A. § 6136, the predecessor to 23 Pa.C.S.A. § 5104(f)).

*includes the testimonial accounts of the events surrounding the question of paternity offered by the lay-witnesses and/or the parties to the suit.*

At bar, the record discloses that the plaintiff had sex with the defendant during the possible period of conception (Memorial Day weekend, 1980) and, exclusively, for two (2) years preceding the birth of the child on January 13, 1981. See Plaintiff's Answers to Defendant's Interrogatories at Nos. 15 & 23. She also possesses the results of the second D.N.A. test, stipulated to by the defendant, evidencing a 99.99% probability of paternity linking the child to the defendant.

On the other hand, the defendant sets forth in his pleadings and answers to interrogatories that he was not seeing the plaintiff during the possible period of conception. It was not until mid-July of 1980 that their relationship re-commenced after a hiatus from December of 1979.

Moreover, the defendant produced three (3) documents in his pre-trial memorandum (relating to the plaintiff's efforts to secure public assistance) prepared by disinterested third-parties after the birth of the child (between March and April of 1981) revealing that the plaintiff had advised each that she *could not* identify the father of the child and that she had been cohabitating with three (3) men at the time while living in Erie, Pennsylvania.[3] See Defendant's Answer to the Plaintiff's Interrogatories at Nos. 41 & 42.

To summarize, this Court finds that the court below abused its discretion in holding that there was no *genuine* issue of material fact as to paternity and that the plaintiff was entitled to judgment as a *matter of law.* We find to the contrary as the presence of the D.N.A. test results do not neutralize the defendant's *denial* of sexual intercourse with the plaintiff during the period of conception and the proposed production

3. Yet, in the plaintiff's answer to the defendant's interrogatories at No 37, the plaintiff denied having intercourse with three (3) different men during the period of conception in her application for public assistance. In Exhibit "A" attached to her answers to interrogatories, the plaintiff stated she lived with the defendant "for a period of one year" after the birth of the child in *January of 1981.*

of witnesses (e.g., Ms. Connie Cokely, Lebanon County Public Assistance and Ms. Mary Musser, Lebanon County Domestic Relations Office) to show that immediately after the child's birth (January 13, 1981) the plaintiff gave information on two separate occasions (in March and April of 1981) that she could not name the father of the child and that she was living with three men (as of 2/11/81) in Erie, Pennsylvania, when she indicated that she had lived with the defendant for 1 year during the same period after the birth of the child.

These matters all weigh on the credibility of the plaintiff, an area the defendant should be permitted to explore before a trier-of-fact and should not be discounted in the face of D.N.A. testing or the exclusion of his brother as the biological father of the child. To accomplish this objective, a request having been made by and granted to the defendant for a jury trial by court order dated September 29, 1992, we reverse the order entering judgment in favor of the plaintiff and remand for a continuation of the case through the judicial process within the framework of a jury trial.[4] See Pa.R.Civ.P. 1910.15(b).

Order reversed, case remanded, and jurisdiction is relinquished.

OLSZEWSKI, J., files a concurring opinion.

OLSZEWSKI, Judge, concurring:

I concur in my esteemed colleague's conclusion that summary judgment is inappropriate in this case even if both Human Leukocyte Antigen (HLA) and Deoxyribonucleic Acid (DNA) tests indicate that the putative father is, in all likelihood, the biological father of the child. I write separately to make the following observation.

It seems to me that the majority is somewhat conclusory in its assertion that "the factfinder (be it jury or judge) [has] it within its prerogative to hold for the putative father/defendant ... regardless of the introduction of one or multiple blood tests (be they of the H.L.A. or D.N.A. variety) establishing a

4. The result would be the same had the defendant waived his right to a jury trial and elected to have his case heard by a judge.

99.99% probability of paternity, if the other facts are support-ive of such a verdict." Majority opinion at 575 (emphasis omitted). This statement is premised on the proposition that HLA tests are not conclusive of paternity. *Smith v. Shaffer*, 511 Pa. 421, 515 A.2d 527 (1986); *Tyler v. King*, 344 Pa.Super. 78, 496 A.2d 16 (1985). Although I cannot dispute that HLA tests alone cannot deprive the jury of its power to decide paternity, it should not follow *ipso facto* that a DNA test which puts a putative father's probability of fatherhood over 99.99% should be treated identically.

Our Court, not to mention legion others, has recognized that DNA tests are far more accurate than HLA tests.

Genetic tests [such as DNA] differ significantly from the blood cell antigen typing performed in the instant case. Genetic evidence provides direct evidence of the extent to which an alleged father and child actually share genetic material. From the results of genetic tests, adequately and accurately performed, it is possible to determine that a particular man did in fact father a particular child.

An affirmative finding of paternity with the same certain-ty cannot be obtained from blood antigen tests, such as were performed in the instant case. Typing red and white blood cell antigens reveals the extent to which an alleged father and child share selected cellular, biomechanical properties. From the results of blood cell antigen tests it is sometimes possible to deduce, with a high degree of reliability, that an alleged father is not the biological father. It is never possible from the same tests, however, to deduce with the same certainty that a particular man fathered a particular child.

*Stahli v. Wittman*, 412 Pa.Super. 281, 603 A.2d 583, *alloc. denied*, 533 Pa. 601, 617 A.2d 1275 (1992). DNA tests have the potential for being highly accurate because each individu-al's DNA is unique, and thus an acceptable "match" of DNA strands between a putative father and child can exclude a much larger population of potential fathers than does an HLA test. *See* E. Donald Shapiro, Stewart Refler, and Claudia Psome, *The DNA Paternity Test: Legislating the Future*

*Paternity Action*, 7 Journal of Law and Health 1 (1993) (hereinafter *"Paternity Test"*); *see also Mastromatteo v. Harkins*, 419 Pa.Super. 329, 335–36, 615 A.2d 390, 393 (1992) (DNA paternity evidence can more accurately identify putative father as biological father and is thus not cumulative of HLA tests), *alloc. denied*, 535 Pa. 648, 633 A.2d 152 (1993).

Our legislature has also recognized that genetic testing is more accurate than HLA blood typing. While results of a DNA test are considered prima facie proof of parentage, 23 Pa.C.S.A. § 4343(c)(2), the same is not true of HLA tests. As we stated in *Stahli:*

> Blood cell typing provides some evidence from which a factfinder may make an affirmative finding of paternity. However, the result is not prima facie evidence of paternity. Before the result of a blood test becomes probative of affirmative paternity, the trier of fact must be able to conclude that the mother and alleged father have engaged in the reproductive act at the relevant time.

*Stahli, supra* at 288, 603 A.2d at 586. Thus, since DNA by law is accorded more evidentiary weight than HLA, it would seem that DNA is not simply another "blood test" which under *Smith v. Shaffer* and *Tyler v. King* is just part of the evidence of paternity.[1]

Indeed, one court has determined that when DNA testing proves with over a 99.99% degree of probability that the putative father is the biological father, a trial is unnecessary. In *Debra L. v. William J.*, 191 A.D.2d 558, 559, 594 N.Y.S.2d 810, 811 (1993), DNA and HLA tests resulted in a 99.99 + % probability that the putative father was the biological father. The trial court accepted father's testimony that he did not

1. The authors of *Paternity Test* argue that when a DNA test results in a possibility of paternity of at least 99.99%, which is the case here, a presumption that the putative father is the biological father should arise, rebuttable "only by clear and convincing evidence that the putative father was totally incapable of fathering the child, or that the putative father has an identical twin, or that the mother has engaged in multiple sexual relations during the time of conception." *Id.* at ——. While our legislature has not, of course, adopted such a provision, it would surely be useful in a case such as this, where the DNA test results are overwhelming and the father's defense is tenuous.

have intercourse with mother, and found for father. The appellate court reversed, stating that

> in view of his prior sexual contact with the mother, and his physical access to her ..., the unchallenged and overwhelming proof of paternity contained in the HLA and DNA test results cause his denials to pale to the point of transparency and are simply not credible. [Father] should not be able to rely solely on a courtroom performance which consists of nothing more than bald denials to defeat objective scientific proof which has identified him as the father to a virtual certainty.

*Id.* at 559, 594 N.Y.S.2d at 811.

Although it is tempting to join the New York courts and hold that the DNA tests can be conclusive, I cannot yet go so far. In *Commonwealth v. Crews,* 536 Pa. 508, 640 A.2d 395 (1994), our Supreme Court questioned the validity of the theory which positively identifies a strand of DNA with a particular individual. For example, a positive identification is determined by the statistical probability of a coincidental match within a random population. The scientific community has yet to agree, however, on how the "random" population should actually be defined—certain genetic traits can appear with greater frequency depending on, among many other factors, the ethnic, geographic, and religious makeup of the chosen population.[2] The Supreme Court thus held, under the relevancy standard for scientific evidence, that an expert can only opine that the DNA tests were performed and that it was "more likely than not" that DNA extracted from blood found at the crime scene could be identified with the defendant. *Id.* at 522–24, 640 A.2d at 402. It remains to be seen what effect *Crews* will have on a civil paternity suit, but suffice it to say that in Pennsylvania, our courts, along with the scientific community, are still grappling with the certainty of interpreting DNA test results. It would seem that taking the case away from the jury, therefore, is an unwise step.

---

**2.** For a very lucid discussion of the issue, see William C. Thompson, "DNA Evidence in Criminal Law: New Developments," *Trial* (August, 1994).

My review of this case thus leaves me with the impression that DNA tests, when performed under the proper conditions, can be highly accurate and leave little or no doubt as to who actually fathered a particular child. But so long as the tests leave room for human error, the putative father should be given the opportunity to challenge the process by which the tests were conducted at trial. Moreover, until the statistical interpretation of the DNA results attains at least general acceptance within the scientific community, the putative father should be able to question the basis for an expert's extrapolation. If these very probative results are to be given presumptive or conclusive weight—and that time may come soon—I believe that the legislature is the proper body to undertake that mission.

I concur.