672 A.2d 814

**Ethel M. RODGERS**

v.

**Merle WOODIN, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 6, 1995.

Filed March 6, 1996.

600

Barry L. Smith, Warren, for appellant.

Marcia M. Ziki, Warren, for appellee.

Before CIRILLO, TAMILIA and BROSKY, JJ.

TAMILIA, Judge.

Merle Woodin takes this appeal from the June 7, 1995 Order finding him to be the father of Laura Lee Rodgers, born July 19, 1981, and ordering him to report to the Domestic Relations Office of Warren County for purposes of establishing proper support payments.

According to the record, mother initially filed a paternity action for the same child against Matthew McCumber on August 12, 1982. Prior to this action, although the two never married or lived together, Mr. McCumber consented to being named as father of the child on the child's birth certificate, allegedly held himself out to the public as the father of the child and offered comfort and support to the child for approximately six months. However, after the paternity action was filed, Mr. McCumber denied being the child's father and subsequent blood grouping tests, including HLA (Human Leukocyte Antigen) results, excluded him as the father and the action was dismissed.

Appellee, on May 19, 1994, through the District Attorney's Office of Warren County, filed the present petition for the support of said child.[1] At the paternity hearing, both parties testified they had intercourse approximately nine and one-half (9–½) months prior to the child's birth. Mother, who was 16

---

1. This support action initially was filed in Chataqua County, New York, but was transferred to Warren County, Pennsylvania, pursuant to a reciprocal support statute of New York.

years old when the child was born, further testified she, on the insistence of her parents, named Mr. McCumber as the father even though they never engaged in sexual intercourse. At the time of the hearing, mother offered the results of blood testing performed by Roche Biomedical Laboratories. Clifton R. Harris, Ph.D., and Associate Director of Paternity Determination at Roche, testified the test results indicated a 99.14 per cent likelihood that appellant is the father of the child.

The trial court, dismissing appellant's claims of laches and estoppel, relied on the blood tests and found against appellant on the issue of paternity. The court thereafter entered a lump sum support Order against appellant for the time frame when mother initially filed the support petition to the date the child left mother's residence to live with her uncle.

On appeal to this Court, putative father argues (1) considering the circumstances of Mr. McCumber, the court should have applied the doctrine of equitable estoppel; (2) after 14 years, wife's claim should be barred by laches; and (3) the trial court should not have accepted the results of the blood tests as conclusive when it was undisputed the tests were defective and contained no HLA result.

This Court's standard of review for a child support Order is a narrow one based upon an abuse of discretion. In these matters, abuse of discretion requires more than error of judgment, rather it requires an overriding or misapplication of the law or a manifestly unreasonable exercise of judgment. *Ball v. Minnick*, 414 Pa.Super. 242, 606 A.2d 1181 (1992), *affirmed* 538 Pa. 441, 648 A.2d 1192 (1994).

Appellant first claims mother's previous relationship with Mr. McCumber and his corresponding actions equitably estopped her from now denying he is the father and claiming appellant is the father. Moreover, appellant claims the trial court ignored well established case law when it stated the doctrine of equitable estoppel is inapplicable in paternity actions.

[U]nder certain circumstances, a person might be estopped from challenging paternity where that person has by his or

her conduct accepted a given person as the father of the child. These estoppel cases indicate that where the principle is operative, blood tests may well be irrelevant, for the law will not permit a person in these situations to challenge the status which he or she has previously accepted. However, the doctrine of estoppel will not apply when evidence establishes that the father failed to accept the child as his own by holding out and/or supporting the child.

*Jones v. Trojak,* 535 Pa. 95, 105–06, 634 A.2d 201, 206 (1993) (citations omitted).

██ Initially, we note that nowhere in the trial court Opinion is it stated the doctrine of equitable estoppel is inapplicable in paternity cases. To the contrary, the court, citing *McCue v. McCue,* 413 Pa.Super. 71, 604 A.2d 738 (1992), specifically states "[a] mother may be estopped from seeking a blood test to determine paternity...." Here, the record reveals Mr. McCumber never held the child out as his own, lived with the child or paid any support for her. *See* 23 Pa.C.S. § 5102(b)(2). Moreover, a judicial determination by the Crawford County courts vacated the support action against Mr. McCumber because blood tests excluded him as the father. Accordingly, we find the record devoid of clear and convincing evidence necessary to evoke the doctrine of equitable estoppel. *See Jefferson v. Perry,* 432 Pa.Super. 651, 639 A.2d 830 (1994).

Appellant next argues mother's delay of almost 12 years in telling him of the child, despite the fact she claims she knew he was the father, requires the doctrine of laches to be applied. Specifically, he claims his rights for custody, visitation and emotional support were denied by mother's actions and, during this 12–year period, he established his own family. Moreover, the trial court, in violation of established law, refused to even consider the doctrine of laches.

██ A party asserting the doctrine of laches must show a delay arising from the other party's failure to exercise due diligence and prejudice from the delay. *Bullock v. Bullock,* 432 Pa.Super. 643, 639 A.2d 826, 828–829 (1994) (citations

omitted). Prejudice is an essential element of laches and in the absence of such the doctrine will not be applied. *Id.* Moreover, the courts have been extremely cautious applying this doctrine to situations in which a child support Order has not been enforced, even when long periods of time are involved. *Id.* Here, we find no prejudice endured by appellant and, in fact, question how any prejudice could exist considering he nowhere acknowledges that he knew of Mr. McCumber or any of the actions mother took with respect to Mr. McCumber. Moreover, to the contrary, he has lived 12 years with no responsibilities or burdens of parenthood and with no financial obligation to the child. In addition, there is no evidence he would have foregone marriage and a family had he known of the child or been required to pay support. Accordingly, we find this claim devoid of merit but add that during the pendency of this appeal, this Court found "Laches as a defense is not available in paternity actions." *Roboski v. Fink*, 447 Pa.Super. 520, ——, 669 A.2d 1017, 1017 (1995).

■ Finally, as a matter of public policy which ranges from decisions of the United States Supreme Court abrogating statutes of limitations in paternity cases during the minority of a child, the acts of Congress in child welfare matters requiring disclosure of a putative father before child welfare payments can be obtained, and the acts of the Pennsylvania Legislature extending the time for bringing paternity actions until the eighteenth birthday of the child (23 Pa.C.S. § 4343(b) Limitation of actions), the doctrine of laches virtually has been nullified in paternity actions. This policy, as with criminal cases extending the statute of limitations on crimes committed against children to two years beyond their eighteenth birthday, recognizes the rights of children to protection when the adults responsible for their care fail to protect their rights. There can be no laches involved as to the rights of children in such circumstances. As with children born in wedlock, the right to support cannot be bargained away by the parents nor can the failure to ask for support at a given moment preclude that right at a subsequent time, no matter how much time has intervened.

Lastly, appellant argues the trial court erred in accepting the results of the blood tests as conclusive, when it was undisputed the tests were defective and contained no HLA result. Appellant argues the expert who testified, who did not perform the tests or compile the results but only reviewed the file one week before trial, insisted all tests were "genetic" when five of the twelve were mere blood typing. With this assertion we agree, and for the following reasons we believe appellant is entitled to relief.

The Uniform Act on Blood Tests to Determine Paternity (Act) provides, in pertinent part:

> In any matter subject to this section in which paternity, parentage or identity of a child is a relevant fact, the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, may or, upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. If any party refuses to submit to the tests, the court may resolve the question of paternity, parentage or identity of a child against the party or enforce its order if the rights of others and the interests of justice so require.

23 Pa.C.S. § 5104(c).

▆ The Pennsylvania Legislature has empowered courts in paternity actions for support to order genetic tests under the provision of 23 Pa.C.S. § 4343(c)(1) and (c)(2):

**(c) Genetic tests.—**

> (1) Upon the request of any party to an action to establish paternity, the court shall require the child and the parties to submit to genetic tests.

> (2) Genetic test results indicating a 99% or greater probability that the alleged father is the father of the child shall create a presumption of paternity which may be rebutted only by clear and convincing evidence that the results of the genetic tests are not reliable in that particular case.

Absent an agreement to the contrary, a party has the full right to challenge the admissibility of blood test results.

*Tyler v. King,* 344 Pa.Super. 78, 88, 496 A.2d 16, 21 (1985). However, the proponent of further blood testing must show by a preponderance of the evidence that the initial test was defective and a subsequent test is needed for an accurate determination of paternity. *Koleski v. Park,* 363 Pa.Super. 22, 30, 525 A.2d 405, 408 (1987).

Appellant contests the validity and accuracy of the tests. Initially, we find the Act to be inconclusive on the question of what constitutes sufficient genetic testing. Here, the record establishes that HLA tests were ordered but, because of complications with the child's blood, could not be reported. Appellee's expert testified at trial, however, that HLA testing could be performed simply by obtaining a new sample of blood from the child (N.T., 5/5/95, p. 53).[2] According to the expert, twelve tests were performed on the parties' blood, including red cell antigens (ABO, Rh, MNSs, Kell, KIDD, Duffy), red cell enzymes and serum proteins (PGMI, ACP, GLOI) and DNA analysis (MCT–118 (CD1580), CSFIPO, FES/FPS). The results obtained were combined to form a paternity index of 115 to 1, which, the expert stated, means appellant is 115 times more likely than a randomly selected Caucasian male to produce a sperm cell with these combined genetic markers (N.T. at 27).

Reviewing the tests administered, we find five of the tests identify the presence of red blood cell antigens. These tests are satisfactory for exclusionary purposes only. *See Stahli v. Wittman,* 412 Pa.Super. 281, 603 A.2d 583 (1992). The inability to use these tests (ABO, Rh, MNSs, Duffy and Kell) to prove paternity stems from the fact that each of these tests measures factors which are found with relatively high frequency in the population at large. Genetic tests, on the other hand, differ significantly from blood cell antigen typing tests. *Id.* In other words, blood typing is not genetic testing. From the results of genetic tests, adequately and accurately performed, it is possible to determine that a particular man did in fact father a particular child. Here, there were three

2. The lab was able to obtain HLA samples from mother's and appellant's blood.

DNA analysis tests performed. However, the expert testified that his laboratory measures at least ten genetic markers (N.T. at 9).

The expert, combining the blood typing tests with the DNA tests, concluded a 99.14 per cent chance of probability. However, this percentage was never qualified as a DNA test by the expert nor does it appear to be such a result from our review of the record. Moreover, the expert never testified as to a percentage probability of paternity relying solely on the DNA tests.

In light of this amalgamated but legally insufficient testing performed by the lab, we find the trial court erred in failing to order a second blood sample test of the child for the HLA tests, which this Court has found admissible not only to disprove paternity, but as affirmative evidence to prove paternity. *See Turek v. Hardy,* 312 Pa.Super. 158, 458 A.2d 562 (1983). While HLA tests are not conclusive evidence of paternity, it is not uncommon for trial courts to permit multiple blood tests when the tests are properly admissible. *See Zearfoss v. Frattaroli,* 435 Pa.Super. 565, 646 A.2d 1238 (1994) (results showed probability of fatherhood to be 99.86% (HLA) and 99.89% (DNA)). Moreover, DNA paternity evidence can more accurately identify a putative as the biological father and is thus not cumulative of HLA tests. *Id.* We also note that according to the testimony of the expert, the state of New York requires an HLA test in every paternity case (N.T. at 52). While this Court is not constrained by New York law, it still should be afforded some consideration since the action initially was transferred from Chatauqua County, New York, according to a reciprocal support enforcement statute.

Finally, we find the additional testing will not result in an undue burden upon the parties, particularly in light of the unique situation between the parties and the lack of any additional indicia of parenthood beyond both parties acknowledgement of sexual intercourse nine months prior to birth. Namely, mother did not initially acknowledge appellant as the father, but rather had Mr. McCumber sign the birth certifi-

cate. It was not until twelve years after the birth of the child, presumedly to avoid the consequences of the New York State Welfare Department, appellee filed a support claim against appellant. Nowhere in the record does she allege that she could not locate appellant prior to this time or that he was able to avoid support obligations. To the contrary, the record reveals the parties lived no more than 20 miles apart and appellant's cousin lived next door to appellee.

Accordingly, we find the trial court erred in refusing to permit a second blood sample of the child to be taken for the purposes of HLA testing.

Order vacated; case remanded for additional blood testing and proceedings thereafter in accordance with paternity and support laws.

Jurisdiction relinquished.