**Adoption of M.T.J.**

**Appeal of R.G. and D.G.**

Superior Court of Pennsylvania.

Argued Oct. 20, 2002.
Filed Dec. 20, 2002.

James T. Owens, West Chester, for appellant.

John J. Teti, West Chester, for participating party.

Before: DEL SOLE, P.J., ORIE MELVIN and BECK, JJ.

OPINION BY BECK, J.

¶ 1 Appellants challenge the trial court's order denying their petition to order blood tests. We affirm.

¶ 2 MTJ was born on February 10, 1995. At the time of his birth, his biological mother was living with SHJ and she named SHJ as father on the birth certificate. It does not appear that Mother ever cared for the child; instead, SHJ had custody of the boy and cared for him for a period of approximately five years. Sometime in April of 2000, SHJ faced a prison term for a drug conviction. In a notarized document, he transferred his "legal guardian rights" of MTJ to the child's maternal Uncle and Aunt.[1]

¶ 3 Uncle and Aunt did not retain custody of the child. Instead, they placed the boy with appellants RG and DG, a couple they knew through their church. One month later, RG and DG filed a Report of Intention to Adopt MTJ with the Chester County Orphans Court. Six months later, RG and DG filed a petition seeking the involuntary termination of parental rights of SHJ as well as another man, TW.[2]

1. The document, which was appended to the Report of Intent to Adopt, provided:
   I, [SHJ], legal guardian of [MTJ], hereby give/transfer to [Uncle and Aunt] legal guardian rights of [MTJ]. These rights include the upbringing of said child in all areas to include his medical and dental needs, religious training and education.

2. In their petition, RG and DG alleged that although SHJ was identified as MTJ's father on the child's birth certificate, Mother now was claiming that TW was MTJ's father. TW filed an answer to the petition. In it he denied paternity but also declared that he would not interfere in the proposed adoption.

¶ 4 SHJ responded to the petition, which he received while housed at the State Correctional Institution in Indiana. In a handwritten letter, SHJ asserted that he had raised his son since the child's birth and that he would *not* relinquish his parental rights. SHJ further stated that he had an agreement with the child's Uncle that Uncle and Aunt would care for MTJ only until SHJ was released from prison. SHJ questioned Uncle's actions in placing MTJ with RG and DG.[3]

¶ 5 In January of 2002, RG and DG filed a petition for blood tests in an effort to establish that SHJ was not MTJ's biological father. SHJ opposed the petition and the trial court, after reviewing memoranda on the issue, denied the petition based on estoppel principles. The court reasoned that Mother was estopped from denying SHJ's paternity and, further, SHJ's name on the birth certificate and conduct as father to the child over the years "clearly, convincingly and conclusively established" his paternity. Trial Court Order dated 3/20/02. The court further stated that RG and DG had "no standing to contest SHJ's paternity in light of the questionable circumstances surrounding [their] assumption of custody in this matter." *Id.* This appeal followed. After a careful review of the relevant law and the record in this case, we affirm the trial court's order.

¶ 6 The record reflects that SHJ cared for his son from the child's birth until he reached five years of age. In April of 2000, SHJ transferred "guardian rights" to Uncle, who then placed the boy with RG

and DG. The child has been in the couple's care since then. During this period, SHJ has been incarcerated.[4] As our recitation of the facts explains, RG and DG filed an intention to adopt MTJ thirty days after they brought the child into their home. This was followed by a petition for termination of parental rights and, later, a request for blood testing.

¶ 7 Ordinarily, when a court decides whether to order blood testing it considers a number of issues, including whether a presumption of paternity exists, whether that presumption has been rebutted and whether estoppel applies to one or more of the parties seeking the tests. Estoppel precludes a party who has acted in a manner that concedes paternity from later challenging paternity in court; these scenarios typically involve persons denying paternity or seeking to prove paternity, often in the context of a support action or custody battle. *See, e.g., Redman v. Radovich,* 451 Pa.Super. 97, 678 A.2d 416 (1996); *Rodgers v. Woodin,* 448 Pa.Super. 598, 672 A.2d 814 (1996); *Woy v. Woy,* 444 Pa.Super. 232, 663 A.2d 759 (1995).

¶ 8 This case is different. Here, RG and DG are not legal custodians, are not alleged to be legal custodians and are not claiming to be legal custodians. Rather, they are third party litigants challenging paternity based on statements alleged to have been made by Mother.[5]

¶ 9 The trial court held that Mother was estopped from denying SHJ's paterni-

---

3. The trial court appointed counsel for SHJ to represent his interests in this matter.

4. The letter SHJ sent in response to the termination petition reveals that SHJ expected to be released from prison on October 3, 2002, but there is no record evidence of SHJ's release or continued confinement.

5. Chester County's children and youth agency is not a party in this case. RG and DG assert that Montgomery County Children, Youth and Family Services Agency (CYS) was involved *with Mother* at the time of MTJ's birth and that the agency would not permit her to have custody of MTJ. There is no allegation of CYS involvement with MTJ throughout the five-year period he spent with SHJ.

ty and, therefore, RG and DG's request for paternity testing was precluded. RG and DG argue that estoppel can apply only to Mother, the person who permitted SHJ to hold himself out as the child's father for a period of many years. But they neglect to mention that their only basis for challenging paternity comes from Mother's new assertion that SHJ is not the child's biological father. To the extent RG and DG rely on Mother to challenge paternity, we agree with the trial court that they are estopped just as Mother would be. *Freedman v. McCandless*, 539 Pa. 584, 654 A.2d 529 (1995). To the extent they seek paternity testing on some independent basis not previously recognized by our courts, and not adequately supported in their brief, we decline to extend the law in that regard.

¶ 10 Further, we agree with the trial court that "SHJ's acknowledgement of paternity and the fact that he provided for the child throughout the child's life ... clearly, convincingly and conclusively establishes" his paternity, making testing improper under these facts. Trial Court Order dated 3/20/02.

¶ 11 While the only issue before us is the propriety of the order denying blood testing,[6] we recognize that this order was made in the context of a termination proceeding. We therefore point out a relatively recent opinion of this court that

6. An interlocutory order granting a request for blood tests is immediately appealable, as is an order denying blood tests based on estoppel principles. *Freedman v. McCandless*, 539 Pa. 584, 593, 654 A.2d 529, 534 n. 7 (1995).

7. Like the couple in *W.C.K.*, RG and DG instituted this termination action on their own accord, pursuant to a provision of the law that permits petitions from persons "standing *in loco parentis* to the child ... who have filed a report of intention to adopt." 23 Pa.C.S.A. § 2512(a)(3). Because they had been caring for MTJ in their home for over six months and because they had filed the requisite adop-

illustrates an additional, and far more serious, problem with this case. In *Adoption of W.C.K,* 748 A.2d 223 (Pa.Super.), *appeal denied,* 567 Pa. 745, 788 A.2d 378 (2000), a nineteen-year-old mother placed her child with a family friend. The arrangement was a temporary one intended only until the young mother was able to "get back on her feet." However, the mother thereafter experienced psychological problems and the friend ultimately gave the child to a couple she knew. Like RG and DG, the couple in *W.C.K.* promptly filed a Report of Intention to Adopt and a Petition for the Termination of Parental Rights. The trial court granted termination and the matter came before this court on appeal.

¶ 12 The panel in *W.C.K.* never reached the merits of the termination order. Instead, it began its analysis by stating that the issue of standing implicated the court's subject matter jurisdiction and so could be raised *sua sponte.* The panel then considered whether the couple had standing to bring the termination action in the first place. Relying on the temporary nature of the agreement between the mother and the friend, the court held that the couple seeking termination did not have true *in loco parentis* status, the only basis upon which they could rely to seek termination.[7] The court observed:

tion paperwork, RG and DG claimed to have standing to seek involuntary termination of SHJ's parental rights. Their subsequent request for blood testing was made pursuant to a statutory provision that authorizes testing in cases where "paternity, parentage or identity of a child is a relevant fact" and the request for blood testing is made "upon motion *of any party to the action.*" 23 Pa.C.S.A. § 5103 (emphasis supplied).

While RG and DG claimed to have satisfied the statutory requirements for bringing a termination case, their case and their status differ significantly from most others. As noted by the trial court, the manner in which RG

Thus, in order for a party to stand *in loco parentis* to a child, that party must first assume parental status through some legally cognizable means. The requirement that assumption of parental status be accomplished through some legally cognizable means is absolutely essential, for it prevents persons who have gained physical possession of a minor child through illegitimate means from using the judicial system to legitimize their wrongful possession of the child. In order for there to be a legitimate assumption of parental status, it is not necessary for the natural parent to expressly consent to an adoption, but at the very least, the natural parent must agree to a permanent placement of his or her child.

*Id.* at 230 (citations omitted).

¶ 13 While the trial court here noted the "questionable circumstances surrounding [RG and DG's] assumption of custody," the court did not hear evidence on the issue of RG and DG's standing to bring a termination proceeding in the first instance, *i.e.,* the manner in which they "acquired" the child. Thus, while we could raise the issue *sua sponte,* the record before us is inadequate for review. Nonetheless, it appears that *W.C.K.* may be dispositive of appellants' rights in this regard. The facts of this case are alarmingly similar to *W.C.K.* and the issue of standing remains.

¶ 14 With respect to the order before us, the denial of blood testing, we conclude that the trial court's order was proper. Order affirmed.

and DG came to care for MTJ is "questionable."