2003 SD 16

**STATE of South Dakota, ex rel., Megan J. BENNETT, Plaintiff and Appellee,**

v.

**Thomas G. PETERSON, Defendant and Appellant.**

No. 22330.

Supreme Court of South Dakota.

Considered on Briefs on Oct. 8, 2002.

Decided Feb. 12, 2003.

---

Lawrence E. Long, Attorney General, Michelle K. Percy, Special Assistant Attorney General, Lead, South Dakota, Attorneys for plaintiff and appellee.

Lee C. "Kit" McCahren, Olinger, Lovald, Robbennolt, McCahren & Reimers, Pierre, South Dakota, Attorneys for defendant and appellant.

FLEMMER, Circuit Judge.

[¶ 1.] Thomas Peterson (Peterson) appeals a decision by the circuit court determining he must pay child support and arrearages to Megan Bennett (Bennett) pursuant to SDCL 25–8–5. We affirm.

FACTS AND PROCEDURAL HISTORY

[¶ 2.] In February 1987 Bennett and Peterson met at the Dark Horse Saloon in Belle Fourche, South Dakota and engaged in sexual relations. As a result of this encounter, Bennett became pregnant and on November 7, 1987, gave birth to a boy, J.M.B.

[¶ 3.] At the time Bennett engaged in sexual relations with Peterson, she was dating another man, Paul Boucher. Bennett believed that Boucher was the father of J.M.B. In 1988 a blood test indicated that Boucher was not the father of J.M.B. At this point, Bennett believed J.M.B.'s father was Peterson.

[¶ 4.] In early 1992 Bennett retained an attorney to pursue the adoption of J.M.B. by her husband at the time, Tim Rosencranz. In March 1992 a meeting was held with Bennett, her attorney, and Peterson for the intended purpose of informing him that J.M.B. was his son and attempting to gain his consent to the step-parent adoption.

[¶ 5.] At the meeting, Bennett told Peterson J.M.B. was his son. After that meeting concluded, the two went to a restaurant and discussed J.M.B. At that time, Peterson acknowledged a resemblance between himself and J.M.B.

[¶ 6.] Shortly thereafter, Bennett began to have second thoughts about the adoption and decided to put the matter on hold. Nevertheless, Bennett's attorney, Brad Schreiber, advised Peterson's attorney that a blood test should be done in the event Bennett desired to pursue the adoption in the future. However, Peterson's attorney, Randy Connelly, advised Bennett that Peterson "was not interested in taking a blood test anymore due to the fact that he does not want to know if he is the father or not," and that Peterson would not challenge the adoption in any way.

[¶ 7.] The adoption never occurred and no documents were sent to Peterson concerning the adoption proceedings or asking him to consent to the adoption. Bennett had no further contact with Peterson until service of the summons and complaint in this action in February 2000. Bennett testified she did not attempt to contact Peterson after 1992 because the "ball was in his [Peterson's] court" and she did not want to disrupt any personal relationships that Peterson may have been engaged in.

[¶ 8.] In her complaint for paternity Bennett requested child support and arrearages. Testing in November of 2000 established a 99.99 percent probability Peterson was the father of J.M.B. On October 4, 2001, the circuit court entered a judgment determining that Peterson was J.M.B's father and ordering him to pay interim child support.

[¶ 9.] A subsequent hearing was set for December 3, 2001. It was scheduled for the purpose of establishing permanent monthly child support and determining the total amount of arrearages. Neither Peterson nor his counsel appeared. Nonetheless, the State proceeded and submitted a sworn statement indicating Peterson's known earnings. Accordingly, the court entered judgment requiring Peterson to pay $478 in child support per month and $47,244 in arrearages.[1]

---

1. On December 7, 2001 the circuit court entered a judgment and order for support stating:

That the Defendant be required to pay child support arrearages from January 1994 through September 30, 2001 in the amount of $44,454 which is computed at $478 per month. Additionally, the Defendant must pay interim support in the amount of $750 for the period of October 1, 2001 through December 31, 2001 which is computed at $250 per month. That as provided by SDCL 25–7–7.4, the above amounts are reduced to a Judgment in the amount of $45,204 plus interest, against Defendant. Judgment is also hereby awarded against Defendant for attorney fees in the amount of $1,700, service of process costs in the amount of $40 and paternity testing in the amount of $300. Defendant is ordered to make payments on said Judgment, the first payment being due and payable on January 1, 2002, with a like payment being due and

[¶ 10.] Peterson filed a motion for reconsideration of that judgment, which the circuit court denied. However, Bennett agreed to reduce the monthly payments to $125 per month and the arrearages to $29,850. Peterson appeals.

### ISSUE

[¶ 11.] **Whether the trial court erred when it ruled Bennett was entitled to child support arrearages pursuant to SDCL 25-8-5 and that the request for arrearages was not barred based on laches, equitable estoppel, or waiver.**

[¶ 12.] We hold the trial court did not err.

### STANDARD OF REVIEW

[¶ 13.] Mixed questions of law and fact that require the reviewing court to apply a legal standard are reviewable de novo. *Phipps Brothers, Inc. v. Nelson's Oil & Gas, Inc.,* 508 N.W.2d 885, 888 (S.D. 1993); *Crouse v. Crouse,* 1996 SD 95, ¶ 6, 552 N.W.2d 413, 415. The question of whether laches is an available defense in a child support case is an issue of law. In re Loomis, 1998 SD 113, ¶ 7, 587 N.W.2d 427, 429; *Fisco v. Department of Human Services,* 659 A.2d 274, 275 (Me.1995). Whether equitable estoppel will deny Bennett the right to bring an action for past due child support is fully reviewable as a mixed question of law and fact. *Crouse,* 1996 SD 95, ¶ 14, 552 N.W.2d at 417.

### ANALYSIS AND DECISION

[¶ 14.] Bennett claims she is entitled to child support arrearages for a period of six years. The statutory basis she uses to support her claim is contained in SDCL 250-8-5. That statute provides:

payable each month thereafter until the to-

The mother may recover from the father a reasonable share of the necessary support of a child born out of wedlock. In the absence of a previous demand in writing served personally or by registered or certified letter addressed to the father at his last known residence, not more than six years support furnished before bringing an action may be recovered from the father.

[¶ 15.] This statute operates to limit the time when the father of a child born out of wedlock can be required to pay child support. In this case, based upon the above statute, Bennett is requesting support six years prior to March 20, 2000, the date Peterson was personally served with the order to show cause, summons and complaint for paternity.

[¶ 16.] Peterson mistakenly relies on this Court's decision *In re Loomis,* 1998 SD 113, 587 N.W.2d 427, as support for his position on appeal. In that case, Loomis also had a brief sexual encounter with a woman that led to her pregnancy. *Id.* at ¶ 2. However, the woman intentionally hid the pregnancy and resulting birth from Loomis for the first fourteen years of the baby's life, even though both lived in Gillette, Wyoming for approximately three years after the birth. *Id.* In that situation, we held that based on the unique facts presented the equitable defense of laches barred the recovery of retroactive child support. *Id.* at ¶¶ 17–18.

[¶ 17.] In order for laches to bar recovery in this case, Peterson must show that Bennett, "1) had full knowledge of the facts upon which the action was based, 2) regardless of this knowledge, she engaged in an unreasonable delay before commencing the suit, and 3) that allowing her to maintain the action would prejudice other parties." *Id.* at ¶ 16, (citing *Conway v.*

tal Judgment of $47,244 is paid in full.

*Conway,* 487 N.W.2d 21, 24 (S.D.1992)). Arguably, the first two elements of this defense are satisfied. Since 1988, Bennett had knowledge that her child was probably Peterson's son. She did not inform Peterson of this until 1992 and did not commence this action until eight years later. Although Bennett waited twelve years to bring this action, Peterson was aware of his potential paternity after only four years. Considering this fact, the trial court did not consider this to be an unreasonable delay before commencing suit, and neither do we. Thus, the doctrine of laches does not prevent recovery.

[¶ 18.] This case is more comparable to *Bonde v. Boland,* 2001 SD 98, 631 N.W.2d 924. Similarly, the father in *Bonde* was advised that he was the parent of the child born out of wedlock. *Id.* at ¶ 2. At that time, the father was prepared to terminate his parental rights so that his child could be adopted. *Id.* However, as in this case, the adoption was never completed. *Id.* at ¶ 3. The father in *Bonde* claimed that "he missed the first three years and nine months of his child's life due to [mother's] misrepresentations." *Id.* at ¶ 20. He also claimed that he proceeded on with his life not knowing that he had a child to support. *Id.* We determined this distinguishable from *Loomis* as Bonde was informed of the pregnancy early on; he knew of the birth; he knew of the adoption attempt; he believed he was the father; and, the relevant time period was significantly shorter. *Id.* at ¶ 14. Accordingly, the equitable defense of laches did not apply to

bar mother from receiving child support arrearages.

[¶ 19.] In addition, Peterson did not establish that he suffered any prejudice by Bennett's actions. Consequently, no evidence exists in the record indicating any hardship created by the support arrearages. Unlike *Loomis,* there is no evidence Peterson has any other support obligations or has moved on to start a new family. If Peterson had wanted a relationship with his child he was provided that opportunity as early as 1992. Again, the record reflects no attempt on his behalf to stay in contact with his child. Therefore, maintaining this action does not prejudice any other parties nor does this consideration bar child support arrearages.

[¶ 20.] Peterson's attempt to raise equitable estoppel as a defense is equally unpersuasive.[2] At the time the child was born, Bennett believed that Boucher was actually the father. It was not until the 1988 blood test that Bennett realized this was not the case. From 1988 until 1992, Bennett knew Peterson was most likely the father of her child and did not convey that information to him. She also knew Peterson had no other way of obtaining this information and could not fulfill his role as a father without that information. Arguably, this could establish equitable estoppel but for the fact Peterson failed to demonstrate how his reliance on the misrepresentation or concealment created prejudice or injury. The concealment in this case ended in 1992. After that time Peterson's course of action did not change. He made no attempts to

---

2. "Equitable estoppel is based on fair dealing, good faith and prejudice." *D.G. v. D.M.K.,* 1996 SD 144, ¶ 37, 557 N.W.2d 235, 242. "Four factors must be met in order for equitable estoppel to bar recovery: (1) a false representation or a concealment of material facts; (2) the victim must have been without knowledge of the real facts; (3) the representation or concealment must have been made with the intent that it be acted on; and (4) the victim must have relied on the misrepresentation or concealment creating prejudice or injury." *Loomis,* 1998 SD 113, ¶ 17, 587 N.W.2d at 430 (quoting *Crouse,* 1996 SD 95, at ¶ 16, 552 N.W.2d at 417).

contact the child or establish a relationship. The record is devoid of any evidence that Peterson moved on with his life by obligating himself to another family or evidence that imposing this obligation would create hardship. Thus, the defense of equitable estoppel has not been established and does not operate to bar support arrearages.[3]

[¶ 21.] Other jurisdictions addressing these issues have recognized the difficulty of these situations. In the case of *Rodgers v. Woodin*, the Superior Court of Pennsylvania opined that:

There can be no laches involved as to the rights of children in such circumstances [paternity actions]. As with children born in wedlock, the right to support cannot be bargained away by the parents nor *can the failure to ask for support at a given moment preclude that right at a subsequent time, no matter how much time has intervened.*

448 Pa.Super. 598, 672 A.2d 814, 818 (1996)(emphasis added). The Supreme Judicial Court of Maine has ruled, based on a child support arrearage's law much like ours, that: "We will not allow such a carefully crafted policy to be defeated by the invocation of equitable defenses in circumstances where the Department has not affirmatively misled the father to believe he would bear no responsibility." *Bell,* 711 A.2d at 1295–1296.

[¶ 22.] Furthermore, at least one justice of this Court has articulated that "the right to support belongs to the children."

*Loomis,* 1998 SD 113, at ¶ 31, 587 N.W.2d at 432 (J. Konenkamp, dissenting) (citing *Weegar v. Bakeberg,* 527 N.W.2d 676, 679 (S.D.1995)). Additionally, "parents may not through misconduct or mistake prejudice their children's right to support." *Id.* at ¶ 32 (citing *Stach v. Stach,* 369 N.W.2d 132, 135–136 (S.D.1985)(holding father was required to make child support payments despite mother's noncompliance with the court's order to pay father his share of equity in marital home). These comments are constant reminders of what our statutes are designed to protect and epitomize the public policy contained in this area of law.

[¶ 23.] Although the initial reason for Bennett to contact Peterson in 1992 was to obtain consent for a step-parent adoption, that adoption was never completed and Peterson was never advised that his parental rights and obligations were terminated. He has also failed to establish that Bennett, at any time, specifically relinquished any right to collect support for their child. Peterson knew since 1992 that a possibility existed that he had a child he was obligated to support but chose to take no action.

[¶ 24.] Peterson has failed to establish any defense that would relieve him from his child support arrearages. As the facts in this case can clearly be distinguished from *Loomis,* the result here is governed by the decision in *Bonde.* The trial court did not err in ruling that Bennett was entitled to child support arrearages.

---

**3.** Peterson also raised the defense of waiver. "Waiver is the voluntary and knowing relinquishment of a right and may be shown by a course of conduct signifying a purpose not to stand on a right, and leading, by a reasonable inference, to the conclusion that the right in question will not be insisted upon." *Department of Human Services v. Bell,* 711 A.2d 1292, 1294–95 (Me.1998) (quoting *Department of Human Services v. Brennick,* 597 A.2d 933, 935 (Me.1991). "Mere delay in the bringing of an action until near the end of a limitations period does not support a reasonable inference that the party has voluntarily and knowingly relinquished the right to act." *Id.* This language alone makes it clear that waiver is not a viable defense and we need not address it at length.

[¶ 25.] The decision of the trial court is affirmed.

[¶ 26.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP and ZINTER, Justices, concur.

[¶ 27.] FLEMMER, Circuit Judge, for AMUNDSON, Retired Justice, disqualified.

[¶ 28.] MEIERHENRY, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.